| 139 | 219 |
| 157 | 627 |

| 139 | 219 |
| 54a | 267 |

| 139 | 219 |
| 75a | 307 |

| 139 | 219 |
| 207 | 220 |

JOHN C. CUSHMAN *et al.*

*v.*

THOMAS C. BONFIELD.

*Filed at Ottawa October 31, 1891.*

1. TRUST—*of purchase under agreement at foreclosure sale—trustee for bondholders.* At a foreclosure sale of the property, rights and franchises of an insolvent railway corporation, the secretary of the company became the purchaser at a sum covering only the costs and expenses of the sale, under an agreement that the bondholders should advance the amount of his bid, and that he should hold the property for their use, and on the direction of a majority of the bondholders should convey the same to a new company then expected to be organized, which new company was to issue bonds to them in lieu of those issued by the old company, the sole object of the sale being to perfect title in such purchaser for the benefit of the bondholders: *Held,* that such purchaser became the trustee for all the bondholders, or at least

of such as were parties to the agreement, and as such accountable to them for the property.

2. SAME—*purchase as trustee under foreclosure of trust deed—continuation of original trust.* Where property is sold under a foreclosure of a deed of trust, and is purchased by one in trust for the *cestuis que trust,* merely as a means of acquiring the title thereto, the property will not be divested of the original trust, but the purchaser will hold the same in trust for the parties secured by the trust deed ; and the failure of a scheme embodied in a contract, under which the purchase was made, will not divest or extinguish the trust. Neither will the failure of some of the *cestuis que trust* to perform their undertakings with the purchaser have any effect upon the rights of others who comply with their agreement.

3. Where railroad property is bought at judicial sale by one as trustee for bondholders of the railway company, under an agreement on their part to deliver their bonds to the trustee, to be exchanged for bonds in a new company to be formed to take the place of the old one, and to pay their share of the amount bid by the trustee, the fact that a majority of such bondholders may repudiate the contract by withdrawing their bonds and the assessments paid by them, will not affect the equitable interest of a bondholder in the property who has kept his agreement and paid his share of the bid, neither will his equitable rights be affected by the failure of the trustee to properly apply assessments paid by him.

4. Where a person bids off property on a foreclosure sale in trust for the holders of bonds secured by mortgage, to be held by the purchaser in trust for such holders, on being paid the amount of his bid, a bondholder who advances the amount of the bid and has the sale confirmed, and seeks to avail himself of the legal title thus obtained, and conveys the property, will take such title, with all the equitable burdens resting upon it, in favor of the other bondholders.

5. In such case, the sale having been made in the interest of all the bondholders, he, as one of such bondholders, will become entitled to an equitable interest proportionate to the number of bonds he owns, while the equitable interests of the other bondholders will remain unaffected ; and if he is compelled to pay more than his share of the expenses of securing the title, he will be entitled to contribution from the other bondholders.

6. SAME—*of sale in fraud of the trust.* Where such bondholder, with full knowledge of the trust reposed in the purchaser at the foreclosure sale, and of the equitable interests of the other bondholders in the property bought, sells and conveys the property to another, and receives and retains for his own use the proceeds of such sale, he will be required to account for such proceeds to the other holders of bonds.

Syllabus.

7. In such case, the concealment of the sale of the property, and the negotiations for the sale by such party from the other bondholders, is evidence of fraud and deception. The fact that he may have been the holder of a majority of the bonds, and had the right to dictate a sale of the property, will not change the result, nor will the fact that a bondholder whose rights were denied may have at some time consented to a sale of the property, or may have had an adverse interest. To deprive him of all right to participate in the sale is evidence of fraud.

8. SAME—*fraudulent conversion—measure of recovery.* Where parties are guilty of a fraudulent disposition or conversion of the equitable interest of another in certain property, the latter may, in equity, recover the value of that interest at the time of the conversion, with interest, regardless of what the defendants actually obtained for it.

9. SAME—*of fraud on beneficiary.* Where a party, though a mere trustee, having no beneficial interest in the property, is an active participant with another having an interest in a scheme to dispose of the equitable interest of another, unknown to him and without his consent, and in a mode intended to operate as an extinguishment of that other's equitable rights, for a mere nominal consideration, he may be held equally chargeable with the principal party for a tortious conversion.

10. A party, after assuming a trust relation, can not purchase in an outstanding paramount title, and hold it adversely to the beneficiary. If he attempts to do so, his purchase will be held to have been made in subordination to the trust with which he is charged.

11. CHANCERY PRACTICE—*relief under general prayer.* Notwithstanding a bill may pray substantially for a specific performance, and fails to ask for any money decree, such a decree may be had under the general prayer for relief.

12. SAME—*allegations not admitted must be proved.* At common law a traversable allegation in a pleading, not denied, is deemed to be implicitly admitted; but this rule does not apply in chancery. These affirmative allegations, either in bill or answer, not expressly admitted, must be proved.

13. SAME—*of new matter alleged in answer.* Where an answer sets up new matter which the complainant can meet by other new matter, the proper practice is to set up such new matter of replication by amendment to the bill. But a complainant is not called upon to amend his bill for the mere purpose of traversing affirmative allegations of the answer, and whether such allegations are met by amendment or not, the defendant is not relieved of the burden of proving them.

APPEAL from the Appellate Court for the Second District;— heard in that court on appeal from the Circuit Court of Kankakee county; the Hon. N. J. PILLSBURY, Judge, presiding.

The Plymouth, Kankakee and Pacific Railroad Company having been organized for the purpose of constructing, owning and operating a railroad from Plymouth, Indiana, to Bureau Junction, Illinois, executed to George W. Cass, as trustee, a deed of trust upon its property, rights and franchises, bearing date July 1, 1871, to secure 3600 of its bonds for $1000 each, due in thirty years, and bearing interest at the rate of seven per cent per annum. These bonds were placed in the hands of parties in New York, London and elsewhere for sale, but only 398 were sold, the residue being afterwards called in, surrendered up and cancelled, in obedience to the requirements of the decree in the foreclosure proceedings hereafter mentioned. The line of railroad contemplated by said corporation was located, a portion at least of the right of way obtained, part of the grading done, and considerable money expended in the purchase of ties and other materials, until sometime in the year 1872, when the company, having exhausted its resources, became insolvent and unable to proceed further with its enterprise.

Default having been made in the payment of the interest on its bonds, a suit was brought September 27, 1873, in the Circuit Court of Jasper county, Indiana, by the holders of certain of said bonds, for a foreclosure of said deed of trust, and on the 25th day of July, 1874, a similar suit was brought by other bond-holders, in the Circuit Court of the United States for the Northern District of Illinois. The venue of the suit in Indiana having been changed to Newton county, a decree was rendered in said suit October 15, 1874, finding the names of the owners of the outstanding bonds and the amount due to each, and ordering a foreclosure of said deed of trust and a sale of the property therein described for the payment thereof. A similar decree was entered in the United States Court August 4, 1876. In the latter decree Thomas P. Bonfield was found to be the owner of eight of said bonds, the amount principal and interest due thereon being $10,360.44, and Wil-

liam C. Richards was found to be the owner of five of said bonds, the amount due thereon being $6624.41. The property, rights and franchises covered by said deed of trust were sold under said decrees June 12, 1877, by the master in chancery of the Federal Court and a commissioner appointed for that purpose by the Indiana Court acting in concert, and John C. Cushman became the purchaser, his bid for the entire property being $4000.

After the company became insolvent and during the pendency of the foreclosure proceedings, John C. Cushman who had been the secretary of said company since its organization, acting in concert with or on behalf of certain of the larger bondholders whose bonds constituted a majority of those outstanding, sought to interest various parties in said railroad enterprise, with a view to re-organizing the company in the interest of the bondholders, and his efforts resulted in a contract in writing, bearing date February 1, 1876, between Cushman, acting on behalf of the bondholders owning a majority of said bonds, of one part, and Oliver W. Barnes of the city of New York, of the other part, by which it was provided, among other things, in substance, that the contracting parties would co-operate by every lawful means to hasten the rendition of a decree of foreclosure and an order of sale in the suit pending in the Circuit Court of the United States, and that at the sale, said property, rights and franchises should be bid in and purchased by said Cushman, as agent of the parties to said contract, and for their joint account, as their several interests should appear in the ownership of said 398 bonds, such purchase to be made at the lowest possible price that would suffice to make the same; that said property, rights and franchises, when purchased by said Cushman, should be by him conveyed, as soon as the same could lawfully be done, to a new corporation to be formed in the States of Indiana and Illinois, and thereafter consolidated under the name of the Lake Shore and Bureau Junction Railroad Company; that

such corporation should be formed for the purpose of constructing, owning and operating a railroad from some point on the Lake Shore and Michigan Southern Railroad near the town of Ligonier in the State of Indiana, to some point on the Pittsburg, Fort Wayne and Chicago Railway at or near the city of Plymouth in said State, thence Westward by way of Dwight and Streator, in the State of Illinois, to Bureau Junction, or some other suitable point in said State on the line of the Chicago, Rock Island and Pacific Railway, west of the city of Ottawa; that the proposed company, on being invested with said rights and franchises, should proceed at once to execute its bonds, in the sum of $1000 each, payable in thirty years, and bearing seven per cent interest, to the amount of $23,000 per mile of the main track of the proposed line of railroad, being about 207 miles in length, said bonds to be secured by a first mortgage or deed of trust upon the road-bed and all other property, rights and franchises of said company; that said company should have power to issue $3,000,000 of capital stock in shares of $100 each, and to increase said stock to an amount not to exceed $4,000,000, and also to issue $1,000,000 of income bonds; that the proposed company should issue to the parties to said contract, and to any other owners of any portion of the outstanding bonds of the old company who should pay their *pro rata* proportion of the costs and expenses of said foreclosure and sale, as soon as said new bonds should be executed, as many of said bonds as they respectively held at the time of said foreclosure, and an additional amount of income bonds equal to the interest coupons due and unpaid on the old bonds.

Provision was then made for the construction by the new company of the railroad contemplated in its organization, and it was provided that for the purpose of such construction, it should enter into a contract with said Barnes, under which he should construct the same in a manner and upon terms fully and particularly prescribed. Barnes, by said contract,

agreed to settle and pay the claim of Cass, the trustee in the deed of trust, against the old company, also certain attorneys' fees, and also the expenses of organizing the new company and the issuing of its stock and bonds, and that he should be reimbursed therefor out of the first moneys coming into the possession of the new company from the sale of income bonds, or from municipal aid.

After the decree of foreclosure was entered in the Federal Court, Cushman caused a circular letter, dated September 20, 1876, and signed, "Bondholders Owning 207 Bonds," and also a paper containing a scheme or plan of re-organization, having attached to it the draft of a contract or warrant of attorney, to be sent to each of the holders of the bonds of the old company. In said circular letter it was suggested, among other things, in substance, that the wiser plan for the bondholders was, to unite in the purchase of the road for themselves, through a trustee, and then find a purchaser; that acting upon that basis, an arrangement had been perfected, so far as possible at the time, by which new companies would be organized in Indiana and Illinois immediately after the sale, to be consolidated as soon thereafter as the law would permit; that when consolidated, the new company would issue bonds to be substituted for those then held by the bondholders entering into the arrangement; that the new company thus to be formed had made such arrangements that the road would be built at an early day; that the scheme had been worked up by Cushman, the secretary of the old company, by his faithful and persistent efforts during the preceding six months; that he, as well as the parties signing the letter, felt perfectly confident of the success of the arrangement if carried out; that Cushman had spared no pains in his efforts to secure such a contract as would build the road and at the same time secure the bondholders, and had been successful; that by said arrangement the bondholders would secure in exchange for their bonds, which were of little or no value, new bonds which would,

by the building of the road, be worth from sixty-five to seventy per cent; that said plan and arrangement had already received the sanction of a majority of the bondholders, and they had requested him to act as trustee and he had consented so to act, for all the bondholders who should unite in said arrangement; that a great advantage to be derived from Cushman's acting alone as such trustee was, that he could then bid off the property at a small price, and thus save a large amount of costs, as the master would sell on commission, and the higher the price the larger the fees of the master would be; that who the parties were who were to form the new company or what were the details of their plans, further than was set forth in the accompanying plan of re-organization, could not then be known, as they made it a prerequisite, before entering into any contract, that these matters should be strictly confidential, lest rival interests should take steps to defeat their enterprise, and that the bondholders therefore must act upon their faith in the integrity and ability of Cushman.

The letter further requested those desiring to participate in the proposed plan of re-organization to sign their names at once to the contract or warrant of attorney accompanying said plan, stating the number of bonds held by them respectively, and then, without detaching it from said plan, to mail it to Cushman, and at the same time to send him by express their said bonds, and the sum of $5 for each bond. It further requested such as declined to enter into the arrangement to so notify Cushman at once, and stated that the road would be advertised for sale as soon as the bondholders were all heard from.

The plan for re-organization accompanying said letter provided for the purchase of the railroad property on behalf of the bondholders, they paying in cash a sufficient amount of the purchase money to meet the necessary expenses of the foreclosure. Also, that the bondholders uniting on said plan should receive for the principal of their bonds new bonds of

like amount and bearing the same rate of interest, secured by a first mortgage on all the property, rights and franchises of the new company, to be part of an issue not exceeding $23,000 per mile of the main track of the proposed railroad; that the interest coupons on the old bonds which were due and unpaid should be paid in bonds secured by a second mortgage and bearing seven per cent interest; that said new bonds were to be received from the new company by a trustee appointed for that purpose by said bondholders, upon the transfer by him to said company of the rights and franchises of the old company, and when so received he was to deliver the same on demand to the bondholders who should have united in said arrangement and paid their *pro rata* share of the expenses of the foreclosure, including all sums that might be required to perfect the absolute title to said property, but that if any bondholder who should enter into said arrangement should fail to pay his *pro rata* share of such advances, then the trustee might borrow the same, or any other person might advance it, and that any sum so borrowed or advanced should be repaid with interest at the rate of ten per cent per annum by the bondholder for whose benefit it should be thus provided, before he should be entitled to receive any bonds or other proceeds of the sale; and should such moneys with interest remain due and unpaid for one year, the trustee might sell the interest of the delinquent bondholder at public auction, after giving certain notice, and after paying the costs of sale and the principal and interest due, pay the residue, if any there should be, to such bondholder or his legal representatives on demand; that if any bondholder should decline to enter into said arrangement, but should elect to receive his *pro rata* share of the proceeds of the sale in cash, then any other bondholder or other person who might advance the money requisite to pay such *pro rata* share should be entitled to receive the bonds of the new company to which such bondholder would have been entitled if he had not declined to enter into the arrangement.

Said paper stated that the estimated costs and expenses of the sale to be paid in cash was $2000, and that the *pro rata* share of the bondholders was estimated at $5 for each bond. It also stated that attorney's fees and the claim of Cass, the trustee, for $2000 and interest had been provided for by special arrangement.

The contract or warrant of attorney attached to said plan of re-organization contained an agreement on the part of the several signers thereto, to unite in the purchase of the property, franchises, etc., of said railroad company about to be sold under said decrees of foreclosure, on the basis of the plan thereto annexed, which it was agreed should be considered as a part of said contract, and they severally appointed said Cushman as their agent and trustee to buy said property at said sale at such price as he should deem for the best interest of the parties to the agreement; and to carry said purchase into full effect, they further agreed to place the bonds held by them respectively in the hands of said trustee, or otherwise as he should designate, and to pay in cash to said trustee at the rate of $5 for each $1000 of the principal of the bonds held by them, for the purpose of defraying the expenses of the foreclosure and sale, and in case said trustee should cause said property, franchises, etc., to be purchased as aforesaid, and a larger sum of money than was thus provided for should be required to complete said purchase, they severally agreed to contribute *pro rata* the money required to make up the deficiency. By said instrument they further authorized said trustee to sell and transfer all the right, title and interest in the property, franchises, etc., so purchased by him to a new railroad company thereafter to be organized, and to receive for them in exchange therefor the securities provided for by said plan of organization.

In response to said circular letter said Bonfield who was the owner of eight of said bonds, and said Richards, who was the owner of five of said bonds, executed the proposed contract or

warrant of attorney, and transmitted the same, together with their bonds and money to the amount of $5 for each bond, to Cushman. The holders of most of the other bonds also signed said contract and accepted said plan of re-organization, so that the entire number of signers included the owners of 383 of the 398 bonds. The railroad property and franchises were thereupon advertised for sale under said decrees of foreclosure and were sold to Cushman for $4000 as already stated. It appears however that the owners of only 139 of said bonds paid the call of $5 per bond, and the money thus realized being insufficient to pay the sum necessary to obtain a confirmation of the sale, Cushman issued another call of $4 per bond. This call was also responded to and paid by both Bonfield and Richards. The total amount paid in however being insufficient, and Cushman being unable, as it appears, to raise the necessary money from other sources, no application was made for a confirmation of said sale, and no conveyance was made by the master and special commissioner of the property and franchises sold until sometime in the year 1881.

Richards having died, the five bonds held by him were sold by his administrator at public sale and purchased by Bonfield. Barnes, as it seems, wholly failed to perform his contract with said bondholders, and the scheme for the re-organization of said railroad enterprise, so far as he was concerned, totally failed. Many of the bondholders became dissatisfied with the situation and lost confidence in Cushman's ability to carry out the plan proposed, and thereupon withdrew from his hands their bonds and the moneys they had advanced to him, until there remained in his hands only thirty-four bonds, thirteen of which belonged to Bonfield.

Cushman persevered in his efforts to raise the money with which to complete his purchase of the railroad property and also to find other parties through whom a re-organization of the railroad enterprise could be effected and the railroad built, and in so doing he was in frequent communication with Bon-

field, and the latter seems to have been during all that time actively co-operating with him to the same end. Nothing however was accomplished by either. Sometime in the latter part of 1880 or the early part of 1881, Cushman learned that some party to him then unknown was engaged in buying up said bonds at a very large discount, and it finally transpired that Joel D. Harvey had bought and had become the owner of about 250 of said bonds. After making such purchase, Harvey had frequent interviews with Cushman and Bonfield by way of consulting with them as to what should be done with the property and what arrangements could be made for completing the enterprise as originally planned. The evidence tends to show that Harvey thus became fully informed of the circumstances under which Cushman became a bidder for and purchased said property, and the rights of Bonfield and the other bondholders growing out of said purchase. Harvey at first filed objections to the confirmation of said sale, but afterwards furnished to Cushman the money necessary to pay the amount of his bid, and thereupon withdrew his said objections, and no other objections being interposed, the sale was confirmed on his motion, and deeds were thereupon executed by the master in chancery of the Federal Court and by the commissioner appointed by the Indiana Court conveying said property and franchises to Cushman.

The evidence tends to show that at some time prior to the date of the confirmation of said sale, a portion of said line of railroad had been sold under a decree of the Circuit Court of Putnam county, Illinois, in a mechanic's lien proceeding, and that a title had been matured through said sale in one Nicholl which was claimed to be paramount to that acquired under said foreclosure proceedings. To extinguish or buy in the title thus obtained Harvey was compelled to pay to Nicholl the sum of $4000.

After making divers unsuccessful attempts to dispose of said property to one of the various railroad companies whose lines

of road connected with the line of the proposed road, Harvey finally succeeded in negotiating a sale of said property and franchises to a new railroad company organized for the purpose of building the proposed road, under the name of the Indiana, Illinois and Iowa Railroad Company. Cushman thereupon, at Harvey's request, executed various conveyances, by which the title to said property and franchises became vested in the last named company. At the time said conveyances were made, Harvey executed to Cushman his certain bonds by which he covenanted to pay, on demand, to any bondholders of the Plymouth, Kankakee and Pacific Railroad Company the sum of $50 for each bond held by them together with all assessments by them paid, or, at the option of said bondholders, upon their first paying their *pro rata* share of all sums necessary to perfect the absolute title to said property, rights and franchises, to deliver to them paid up certificates of stock in the company which should thereafter become the successor of the Plymouth, Kankakee and Pacific Railroad Company to the amount of $1000 for each bond held by them, or, if they should decline to receive said money or stock, to hold said Cushman harmless against all loss, costs, damages or expenses to which said bondholder or any other persons might seek to subject him by reason of said conveyances, and to pay all judgments, costs and expenses that might be awarded or rendered against him in any suit or proceeding growing out of said conveyances, or of his trusteeship for the holders of any of said bonds.

The price for which Harvey sold said railroad property was $150,000, but the sale seems to have been made upon terms which required him to subscribe that sum to the capital stock of the Western Air Line Construction Company, a corporation organized to build the proposed line of railroad. Said subscription was made, so that practically, the consideration received by him for said property was $150,000 of the capital stock of said construction company. The proposed disposi-.

tion of said railroad property to the Indiana, Illinois and Iowa Railroad Company was intentionally concealed from Bonfield until after it was fully consummated, the excuse for such concealment being, that Bonfield was at the time the president of another railroad company organized for the purpose of building another and to some extent a competing line of railroad.

Bonfield declined to receive payment for his bonds either in money or stock at the rates proposed by Harvey in the indemnity bonds given by him to Cushman, and thereupon brought his suit in chancery against Cushman, Harvey, the Indiana, Illinois and Iowa Railroad Company and various other parties, setting up the trust vested in Cushman for the benefit of the complainant and the other bondholders of the Plymouth, Kankakee and Pacific Railroad Company, and charging a fraudulent conspiracy between him and Harvey to cheat and defraud the complainant out of his equitable rights, and praying, in substance, that the Indiana, Illinois and Iowa Railroad Company be required to issue to the complainant and the other bondholders first mortgage bonds, according to their respective rights and to said plan of re-organization; that the issue of bonds by said company be limited to such amount as should be sufficient to finish, operate and maintain said road; or that a receiver be appointed to take possession of said property, rights and franchises and organize a new company in accordance with said trusts and said plan of organization, and convey said property, rights and franchises to such new company, and that such new company be required to execute bonds and mortgages in accordance with said plan of re-organization and carry out said trusts; that the deeds by which Cushman had conveyed said property, rights and franchises to the Indiana, Illinois and Iowa Railroad Company be cancelled and set aside, and that the complainant might have such other and further relief as equity and good conscience might require.

Cushman answered the bill alleging that by reason of the failure of the parties who had promised pecuniary assistance in completing the purchase and in constructing the road to keep any of their agreements, the plan for the reorganization of said railroad enterprise had wholly failed; that Cushman being without sufficient funds to pay his bid of $4000, had been under the necessity of forming a new scheme for obtaining title to the railroad property for the bondholders; that after consulting with the bondholders' attorney and on his advice, he had sent to the bondholders a circular in which he gave them notice of the failure of the first scheme and submitted a proposition that the title should be perfected in him, Cushman, for the benefit of those bondholders who should pay their proportion of the purchase price, at the same time making a call for $9 per bond, including former payments, and distinctly announcing that he would be governed, in the execution of his trust, by a majority of the bondholders in interest; that among many others responding was the complainant, who not only paid said call but heartily approved of the scheme, and often expressed a desire to pay more for the purpose of acquiring an interest in the rights of other bondholders who failed to pay their assessment; that a large majority of the bondholders failed to pay said assessment, and defendant was therefore without means to comply with his bid, and that this state of affairs continued for three years and over, during which time defendant never had the money necessary to consummate his purchase and get the title to said property in his hands; that during that time a large proportion of the bondholders who had paid withdrew their bonds and the money paid by them; that on the 13th day of May, 1881, Harvey, having become the purchaser of over three-fourths of said bonds, furnished the defendant with the necessary funds to complete said purchase, and that he thereupon paid $4000 into court and received deeds of said property from the proper officers; that after receiving said deed and before

the filing of the bill of complaint herein, defendant, upon the request of those who represented over five-sixths of said 398 bonds, conveyed said property to the Indiana, Illinois and Iowa Railroad Company; that up to the time Harvey became interested in said property, there was little or no value to said bonds, and that defendant had diligently but in vain negotiated in order to give them a greater value, but that all his schemes for re-organizing or building the road or making the property of any value had utterly and hopelessly failed.

By said answer Cushman denies all conspiracy with Harvey, and avers that said conveyance was made upon the request of the holders of a large majority of said bonds; that Harvey had acquired the ownership of a large majority of said bonds before defendant was aware of it, and that he had no interest with Harvey in their purchase; that before the conveyance of said property and franchises to the Indiana, Illinois and Iowa Railroad Company, he exacted of Harvey an agreement to pay the owners of the bonds still remaining in his hands the sum of $50 per bond, together with all assessments paid by them, or in lieu thereof, upon their first paying their share of the cost and expense necessary to secure the absolute title to said property and franchises, to deliver to them ten shares, of $100 each, of the full paid stock of said Indiana, Illinois and Iowa Railroad Company, for each bond held by them; that he was under no legal obligation to the owners of said bonds to exact said agreement or any other agreement from Harvey, but he did so as his own voluntary act, and for, as he believed, the full value of said bonds.

The answer further alleges that the property of the Plymouth, Kankakee and Pacific Railroad Company was by reason of its imperfect title, the condition of the work already done, its geographical condition, and other causes, of but little value; that on the 3d day of March, 1875, a decree was rendered by the Circuit Court of Putnam county, Illinois, for $3168, which was declared to be a lien on said property prior to the deed of

trust securing said bonds, under which said property had been sold; that the payment of the fees and charges of the attorneys for the bondholders, of the master in chancery, and of the commissioner, and the amount of his bid for said property and franchises, required the expenditure of nearly $10,000, which was furnished by Harvey for that purpose, and that without such payments it would have been impossible to secure a confirmation of said sale; that the sums paid by the complainant and the other bondholders was wholly inadequate, and had long before been expended in the payment of expenses not directly connected with the confirmation of said sale, such as recording deeds for right of way, and procuring the return and cancellation of the bonds which had not been sold. Said answer further alleged that the defendant had observed entire good faith in the disposition of the title obtained by him as aforesaid.

The Indiana, Illinois and Iowa Railroad Company answered, denying all knowledge of the equities existing between the complainant, Cushman and the other bondholders, and alleging that it took said conveyances from Cushman without notice of, any trust in said property in favor of the complainant. Said answer also denied that Cushman ever had any valid claim or legal title to said property and set up a paramount title derived through the sale under said decree of the Circuit Court of Putnam county. It is also alleged that, since going into possession of said property, it had expended, in procuring right of way and in repairs and construction a large sum of money, to-wit, $2,000,000, and that said money had been expended by said company believing that it had acquired and was possessed of an absolute and unconditional title to the property.

Harvey answered denying that Cushman was ever a trustee for the complainant as to the title or claim acquired by Cushman to said railroad property, and alleging that defendant furnished the money necessary to satisfy Cushman's bid, the.

sum thus furnished being $10,000; that said property and franchises were of no considerable value, and the answer sets. up paramount title thereto through a conveyance from Nicholl, the complainant in the mechanic's lien suit in the Circuit. Court of Putnam county.

At the hearing, which was had on pleadings and proofs, the court found that the equities were with the complainant. It further found that Harvey, after becoming the owner of a majority of said bonds, entered into a fraudulent conspiracy with Cushman to cheat the complainant and other bondholders out of their interests in said property, rights and franchises, and to convey the same, to their use, to the exclusion of the complainant, and that in execution of said conspiracy, they executed said conveyances by which said property, rights and franchises were transferred to the Indiana, Illinois and Iowa Railroad Company; that the consideration of said conveyances. was $150,000, no part of which had been paid to the complainant, and that after deducting the sum of $4000 paid for the mechanic's lien on said property, the complainant was. entitled to his *pro rata* share of the sum so received and interest thereon; that at the time of said conveyances by Cushman said property was of the value of $150,000, and that complainant's equitable interest in the trust estate vested in Cushman was thirteen three-hundred-and-ninety-eighths. The court thereupon rendered a money decree in favor of the complainant and against Cushman and Harvey for $7057.80, that. being the amount of the complainant's *pro rata* share in the proceeds of said property and interest thereon, and also for costs of suit, and awarded execution therefor, and the bill was. ordered to be dismissed as to the Indiana, Illinois and Iowa Railroad Company and the other defendants named in the bill.

Cushman and Harvey thereupon appealed to the Appellate Court of the Second District where said decree was affirmed, and by a further appeal they now bring the record to this court for review.

Messrs. G. W. & J. T. KRETZINGER, and Mr. H. K. WHEELER, for the appellants.

Mr. G. S. ELDRIDGE, for the appellee.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

No question is or can be made, that, under the arrangement in pursuance of which Cushman became the purchaser, at the foreclosure sale, of the property, rights and franchises of the Plymouth, Kankakee and Pacific Railroad Company, he became charged with a trust in favor of Bonfield and the other bondholders who placed their bonds in his hands, and that he bid off said property, rights and franchises as their trustee. Nor would there seem to be any doubt that said trust relation continued up to the time the sale was confirmed and the master's deed executed to Cushman, or up to the time of the conveyances by which said railroad property became vested in the Indiana, Illinois and Iowa Railroad Company.

True said trust relation was originally formed as a part, or at least in furtherance, of the scheme for the re-organization of the railroad enterprise embodied in the contract of February 1, 1876, between Cushman, acting for the majority of the bondholders, and Barnes, and it is also true that Barnes wholly failed to perform said contract, and that the scheme thereby contemplated was abandoned, but it does not follow that the trust relation between Cushman and said bondholders was thereby terminated. The bondholders, by virtue of their bonds and the deed of trust securing the same, had a first lien on the railroad property, and were entitled, on foreclosure and sale, to have the proceeds, after the payment of costs, applied upon the indebtedness evidenced by their bonds. It was of course for their interest, if they relied for satisfaction upon the foreclosure alone, to have the property sold in such manner as to bring the highest possible price. The arrangement under which the sale took place, however, had precisely

the opposite result in view, viz, a sale for barely enough to discharge the costs of the foreclosure, and consequently in such manner as to realize nothing whatever for distribution among the bondholders. This was the mode of sale outlined and insisted upon in the plan of re-organization submitted to and concurred in by all the bondholders, except a very few whose interests are not in question here. But the object of the sale, according to the scheme thus adopted, was not to realize a sum of money with which to pay and discharge the bonds, but to perfect title in a trustee for the benefit of the bondholders, so that the property might afterwards be disposed of in such manner as should be most for their advantage.

By this scheme all competition in bidding was practically obviated. The bondholders had no interest in enhancing the price by bidding, as it was made to their advantage to have the property bid in, if possible, at a nominal price. Other creditors had no incentive to bid, as no part of the money realized would be applicable to the payment of their demands until after the payment of the full amount, principal and interest, due on the bonds, a sum which seems to have been largely in excess of the full value of the property. Third parties had no interest in bidding, as they must have known that, as against them, the bondholders would be sure to run the property up to a price equal to or beyond its value. By making it for the interest of the bondholders, therefore, not to become bidders, Cushman was able to buy the property in for such sum as he saw fit to bid, and it was struck off to him in pursuance of said arrangement for $4000, a sum which, as the evidence seems to show, was only a small fraction of its actual value.

Cushman's purchase having been made under these circumstances, it seems too plain for argument, that he held whatever rights he thus obtained in trust for all the bondholders, or at least in trust for those who accepted and became parties to the arrangement under which the sale took place. And it

seems equally clear that the trust thus created was impressed upon and followed the title which was subsequently perfected in Cushman by the execution of the master's deed in pursuance of said sale. The failure of the scheme embodied in the Barnes contract did not divest or extinguish said trust, as such failure in no way restored the bondholders to the position in which they stood before the sale. It gave them no opportunity or right to have the property re-sold, so as to have it bring its true value, but Cushman, on the contrary, persisted in adhering to his bid, and subsequently obtained a confirmation of the sale and a conveyance of the title.

Nor was Bonfield's beneficial interest in Cushman's bid divested or extinguished by the fact that Cushman, for more than three years after the bid was made, was unable to obtain from the bondholders the funds necessary to pay the amount bid. It was at first supposed that only about $2000 in money would have to be raised for that purpose, and such would probably have been the case if the Barnes contract had been carried out, as that contract provided for the payment in another way of a portion of the expenses which the $4000 bid was intended to cover, viz, attorney's fees and the fees and charges of the trustee in the deed of trust. It was upon this supposition that the call for $5 on each bond was made at the time the scheme for re-organization embodied in the Barnes contract was proposed to the bondholders for their adoption. This assessment was promptly paid by Bonfield, and the same was true of Richards whose bonds Bonfield afterward purchased. A large majority of the bondholders, however, failed to pay said call, but their failure in no way affected Bonfield's equitable rights. It was not a part of said scheme that each bondholder was to assume the responsibility of surety for all the others. Subsequently another assessment of $4 per bond was made by Cushman, and this assessment also was promptly met by both Bonfield and Richards. The assessments thus paid constituted nearly though not quite the entire amount of

Bonfield's *pro rata* share of the $4000 bid for the property. No other assessment was made, and it can not therefore be justly claimed that Bonfield lost or forfeited any of his equitable rights by a failure to share in the burdens which the trust imposed upon him.

Nor were Bonfield's equitable interests in the property bid off by Cushman divested or affected by the act of a large majority of the bondholders who had originally joined in the plan of re-organization, withdrawing their bonds and the assessments paid by them from Cushman. It may be that such withdrawal was an abandonment on the part of those withdrawing of their equitable interests acquired through their assent to said plan of re-organization, but no act on their part could affect the vested rights of Bonfield. If Cushman, upon such withdrawal, had abandoned his bid and all rights under it, and suffered the property to be again sold under the foreclosure decree, perhaps a different result would have followed, but so long as the bid was adhered to and insisted upon, Bonfield's equitable rights in the bid and the property purchased could be divested only by his own voluntary act.

The learned counsel for the appellants strenuously insist that the evidence establishes an abandonment by Bonfield of his equitable rights resulting from said bid, but in this we think they are clearly mistaken. Expressions are to be found in certain of his letters appearing in evidence indicating that in his opinion the precise scheme for disposing of the railroad property outlined in the original plan for re-organization had failed, but the evidence is perfectly clear that, up to the time when, without his knowledge, Cushman, at Harvey's request, conveyed said property to the Indiana, Illinois and Iowa Railroad Company, he was endeavoring, in conjunction with Cushman, and in conjunction with Harvey after he appeared upon the scene, to raise the money with which to pay Cushman's bid so as to get the sale confirmed and the title perfected, and also to find, either in some existing railroad company, or in

some company to be organized for the purpose, a suitable pur-
chaser for said property. His conduct during all that period
is shown to have been utterly inconsistent with the theory that
he had abandoned his rights to said property, but to have con-
sisted of what was tantamount to a repeated and persistent
assertion of his equitable interest therein.

But it is said that Harvey, who was not a party to the orig-
inal plan of re-organization, by intervening and furnishing to
Cushman the entire sum of money necessary to pay said bid,
obtained a right to avail himself of said bid, to the exclusion
of Bonfield. To this view we are unable to assent. Harvey
had purchased and become the owner of over three-fourths of
the outstanding bonds, and of course became entitled to those
rights which such ownership gave him. At first he filed in
the Federal Court objections to the confirmation of the sale of
the railroad property to Cushman, and if he had persisted in
his objections and succeeded in having a confirmation refused
and the sale vacated, he would have been enabled to proceed
with the enforcement of his rights in any legal mode, untram-
melled by any equitable consideration growing out of the pre-
vious arrangement between the bondholders in pursuance of
which Cushman had bid off the property. A sale *de novo* would
then doubtless have been ordered, and at such sale any one
or all of the bondholders might have taken steps to have the
property bring its full value, and would each have been com-
pelled to accept in full of his rights in the mortgaged prop-
erty his *pro rata* share of the net proceeds of the sale. If at
such sale Harvey had become the purchaser, his title would of
course have been freed from all equities in favor of the other
bond-holders. But by obtaining a confirmation of the sale
already made and seeking to avail himself of the title thus
obtained, he took such title with all the equitable burdens
resting upon it. Said sale having been made in the interest
of all the bondholders, he as a bondholder became entitled to
an equitable interest proportionate to the number of bonds of

16—139 ILL.

which he had become the owner, while the equitable interests of Bonfield and the other bondholders remained unaffected.

If Harvey was compelled to pay more than his share of the expense of securing the title, he is doubtless entitled to proportionate remuneration from the other bondholders. The evidence seems to be, that the $4000 actually used by Cushman in paying his bid was furnished by Harvey, but the money paid by Bonfield, and by Richards whose bonds Bonfield had purchased, upon the two assessments made by Cushman, amounted to within less than $14 of the *pro rata* share of the $4000 due from Bonfield on account of his thirteen bonds.

It is true the money paid by Bonfield does not seem to have been used by Cushman in paying his bid, but in paying other expenses attending the perfecting of the title which Harvey afterwards sold to his new railroad company, such as the expense of recording deeds conveying right of way, etc., but it was not Bonfield's fault that the money contributed by him was not used for the purpose for which it was assessed and collected, and the purposes to which it was applied were doubtless relatively as effectual in enhancing the value of the title afterwards disposed of by Harvey as was the payment of the bid itself.

It should be observed in this connection that Harvey is shown by the evidence to have had full knowledge of the arrangement under which Cushman bid in the property for the benefit of the bondholders. This is shown very clearly by Bonfield's testimony, and may also be fairly inferred from the terms of the indemnity bonds given by Harvey to Cushman at the time the latter conveyed said railroad property to Harvey's new railroad company.

It thus appears that Harvey, with full knowledge of the trust reposed in Cushman and of Bonfield's equitable interest in said railroad property, sold said property to the Indiana, Illinois and Iowa Railroad Company, a company organized by him for the purpose of becoming such purchaser and of which

Harvey became the president, and received and retained for his own use the entire proceeds of such sale. Having thus in his possession the proceeds of trust property, the law very properly charges him as trustee and holds him accountable as such.

Not only is this true, but we are of the opinion that the evidence sustains the charges of fraud and conspiracy made by the bill against Cushman and Harvey. It is clearly shown, and does not seem to be disputed, that while both Cushman and Harvey were having frequent conferences and correspondence with Bonfield in relation to making some proper disposition of said railroad property, they secretly and without his knowledge organized the Indiana, Illinois and Iowa Railroad Company and turned said property over to that company on their own terms, keeping the whole transaction purposely concealed from him until after it had been fully consummated. The only recognition of Bonfield's rights in the whole transaction was a provision in the agreement between Cushman and Harvey by which Bonfield was to be paid $50 for each bond held by him and be reimbursed the assessments which he had paid, or that he should be given, in lieu of such payments, stock in the new company to the nominal amount of $1000 for each bond. The only excuse put forward by Cushman and Harvey for these clandestine transactions is, that Bonfield at the time was the president of another railroad company whose proposed line of railroad might to some extent compete with the line embraced in the property they were seeking to dispose of.

There can be no doubt that the disposition of said property in this mode was an actual and intentional fraud upon the rights of Bonfield. It will not do to say that it was made by a party who held a large majority of the bonds, and who by virtue of that fact had a right to dictate the terms of sale; nor that Bonfield had previously consented, either expressly or tacitly that such disposition of the property might ulti-

mately be made as should be determined upon by the owners of the majority of the bonds.   Notwithstanding such consent he, as one of the equitable owners of the property, had a right to be heard and to be consulted, and the careful, studious and intentional concealment from him of the entire transaction until after it was fully consummated, was a clear disregard and positive violation of his equitable rights.   Such concealment could have been resorted to only for the purpose of excluding him from all participation in the disposition of property of which he was a part owner.   Nor was the fact that he was the representative of a rival railroad enterprise any excuse.   So long as he had an interest in the property to be sold, he was entitled to all the rights which such interest gave him, and it was not in the power of his co-owners, however much they may have been in the majority, to deprive him of such rights.

Said transaction also evidences an intention to compel Bonfield, whether willing or not, to accept the small sum of $50 each for his bonds, or to take, what we must presume was only a fair equivalent for that sum, $1000 of the full paid stock of the new railroad company.   Such attempt by Cushman and Harvey to force Bonfield to sell out at their terms was of course without legal validity, but it furnishes additional evidence of a fraudulent conspiracy on their part to deprive him of his equitable rights.

The theory upon which the decree in this case is sought to be sustained is, that Cushman and Harvey are guilty of a fraudulent disposition or conversion of Bonfield's equitable interest in said railroad property, and he now seeks to recover from them the value of said interest at the time of said conversion, such value being based upon and determined by the price for which the entire property was sold.   The price received by Harvey was $150,000; but by the terms of the sale payment was made by delivering to Harvey $150,000 of the full paid stock of the Western Air Line Construction Company.

The appellants claim that, at the utmost, Bonfield is entitled to demand only his proportionate share of said stock, and that they now profess to be willing to deliver to him. To this claim there are at least two sufficient answers. First, Bonfield is seeking to recover upon the theory of a fraudulent conversion of his property, and such conversion being shown, he is entitled to recover the value of his property at the time of the conversion, with interest, regardless of what the defendants actually obtained for it. Secondly, if the defendants had desired to discharge themselves of their liability to the complainant by delivering to him his proportion of said stock, they should have delivered or tendered it to him within a reasonable time after the sale. The sale took place in June, 1881, but no offer to deliver to the complainant any portion of said stock is shown to have been made prior to the final hearing of this case, which took place about nine years afterwards. The only thing in the nature of a tender which took place even at that time was an expression by Harvey, when he was being examined as a witness, of a readiness and willingness to deliver to Bonfield his *pro rata* share of said stock. In the meantime, however, the stock, which at the time it was received by Harvey, as the evidence tends to show, was worth its full par value, had become substantially valueless. If it had been delivered to Bonfield when first received, he doubtless might have disposed of it in such way as to have realized its par value, but the defendants having kept it until it has become worthless, can not discharge themselves by tendering it now, but must respond to the complainant for what it was worth when they received it, with interest.

As we have just remarked, the stock of the Western Air Line Construction Company, at the time of the sale of said railroad property, was substantially at par. The entire amount of stock of said company was $1,000,000, of which other stock-holders purchased for cash at par $850,000, and the railroad property transferred by Cushman and Harvey, upon

which about $750,000 in labor and money had been expended, was in some way turned in and taken as an equivalent for the remaining $150,000 of its capital stock. We are of the opinion that the Circuit Court was correct in estimating the value of the railroad property sold and of the stock received at $150,-000, and in fixing the amount Bonfield was entitled to recover on that basis. The court held that the defendants were liable to him to the amount of thirteen three-hundred-and-ninety-eighths of $150,000 with interest, after deducting the $4000 paid by Harvey for the Nicholl claim, and upon that basis a decree was entered for the complainant for $7057.80. We are of the opinion that the decree is fully sustained by the evidence and by the rules of law applicable to the case.

The point is made that, whatever may be Harvey's liability, Cushman should not have been held liable. It is claimed that he was merely a trustee having no personal interest in the subject matter of the trust; that he received no part of the proceeds of the sale, but merely conveyed the property, as was his legal duty, in accordance with the direction and request of the owner of a majority of the bonds, and that having made such conveyance, he has no further responsibility in the matter. In this view we are unable to concur. The evidence clearly shows that Cushman was an active participant with Harvey in the scheme to dispose of said property unbeknown to Bonfield and without his consent or concurrence, and in a mode intended to operate as an extinguishment of Bonfield's equitable rights for a mere nominal consideration, and we see no reason why Cushman should not be held chargeable equally with Harvey for such tortious conversion of the trust property.

The point is also made that the decree is not warranted by the prayer of the bill. It is true there is no specific prayer for a money decree, the relief specifically prayed for being what would be substantially a specific enforcement of the plan of re-organization embodied in the agreement to which nearly all the bond-holders subscribed, by issuing to the complainant

first mortgage bonds of the company to which the railroad property was transferred, in exchange for those already held by him. The bill however contains the general prayer for relief, and under that prayer, as the rule seems to be well settled in this State, the decree rendered was proper. *McMillan* v. *James*, 105 Ill. 194; *Haworth* v. *Taylor*, 108 id. 275; *Curyea* v. *Berry*, 84 id. 600; *McGhee* v. *Wright*, 16 id. 555; *Stanley* v. *Valentine*, 79 id. 544; *Hopkins* v. *Snedaker*, 71 id. 449; *Isaacs* v. *Steel*, 3 Scam. 97; *Bruner* v. *Manlove*, id. 339.

It is also claimed that the Nicholl title to a portion of the railroad property derived through the mechanic's lien proceedings was paramount to the title acquired by Cushman through the foreclosure sale, and that Harvey, having bought in that title, has a right to hold and set it up as a paramount title against Bonfield and the other bondholders. To this claim it may be replied, first, that there is no sufficient proof in the record that the mechanic's lien title was paramount to the title acquired through the foreclosure proceedings. The defendants set up the mechanic's lien title in their answer, and make certain averments in relation thereto which, if true, would tend to show that such title was paramount, and they claim that because no issue was taken upon their allegations in that behalf, such allegations must be taken to be impliedly admitted.

At common law a traversable allegation in a pleading not denied is deemed to be impliedly admitted, but the rule of admissions by implication does not obtain in chancery pleadings. There affirmative allegations either in bill or answer not expressly admitted must be proved. Where an answer sets up new matter which the complainant can meet by other new matter by way of avoidance, the proper practice, since special replications in chancery have gone into disuse, is to set up such new matter of replication by amendment to the bill. But a complainant is not called upon to amend his bill for the mere purpose of traversing affirmative allegations of the answer, and whether such allegations are met by amendment or

not, the defendant is not relieved from the burden of proving them. We find nothing in the record, apart from the averments of the defendants' answer tending to establish the character or validity of the Nicholl title, or which shows it to have been paramount to the foreclosure title.

But even if it were admitted to be paramount, it is clear that Harvey, after assuming the trust relation which he did by coming in under the title acquired by Cushman through the foreclosure sale, could not purchase in an outstanding paramount title and hold it adversely to Bonfield, the beneficiary. For what he was compelled to pay in buying in such outstanding title, he was of course entitled to credit in his accounting with Bonfield, but his purchase must be held to have been made in subordination to the trust with which he was already charged.

After careful consideration of the entire record we are of the opinion that the decree is the correct and proper result of the evidence, and it follows that the judgment of the Appellate Court affirming said decree must be affirmed.

*Judgment affirmed.*