## Richmond

AMERICAN NATIONAL BANK OF PORTSMOUTH V. KATE
WALKER AMES AND OTHERS.

January 13, 1938.

Present, All the Justices.

712

The opinion states the case.

*Tazewell Taylor, L. E. Birdzell* and *Vincent L. Parker,* for the appellant.

*James E. Heath, William G. Maupin* and *Savage & Lawrence,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

Prior to July 9, 1929, The First National Bank of Portsmouth, Virginia, was in a normal and healthy condition. It had, on the preceding April 15, been examined by a national bank examiner, whose report showed it to have total resources of $3,347,288.06, deposits of $2,211,560.63, a paid-up capital of $300,000, a surplus of $100,000, undivided profits of $45,480.74, and reserves of $46,800. Out of a total of loans and discounts, amounting to $2,160,388.06, the examiner classified only $32,523.80 as a loss, and by July 9, $27,892.80 of these had been charged off.

Between April 15 and July 15, 1929, there were new discounts aggregating $367,927.97, all of which, with the exception of $6,909.49, were collected during the subsequent liquidation.

Some of the officers and directors of The First National Bank of Portsmouth were likewise officers and directors of the State Bank of Portsmouth. Consequently there existed, and was recognized generally by the public, an intimate relationship between the two institutions.

Due to the disclosure of the defalcation of its cashier, there was a run on the State Bank of Portsmouth, and being unable to withstand the abnormal withdrawal of its deposits that institution was forced to close its doors. This

resulted in considerable unrest among the local public and occasioned a run on The First National Bank of Portsmouth. It became apparent that without substantial financial assistance the latter bank would be unable to continue business. Assistance from the Norfolk & Portsmouth Clearing House Association was sought and refused.

Following this refusal, on Friday, July 12, 1929, a special meeting of the board of directors of The First National Bank was called and held, at which it was resolved that, because of the emergency existing, negotiations should be entered into with such other banking institution as might agree "to accept a sufficient amount of its assets to guarantee all liabilities of every nature except the stockholders' liability."

By invitation George R. Parrish and Frank D. Lawrence, respectively vice-president and cashier of The American National Bank, were present at this meeting. The American National Bank advanced to The First National Bank a substantial sum which enabled the latter to open its doors on the following morning and to meet all demands upon it.

July 13th fell on Saturday, and immediately after the closing of the banking hours on that day the officers of The American National Bank, together with the necessary clerical force, began an examination of the assets of The First National Bank. This examination consumed practically the entire day and night of Saturday, July 13, and all day Sunday, July 14.

When the examination had been completed the officers of The American National Bank announced that they were willing to recommend to their board the execution of a contract whereby the liabilities of The First National Bank would be assumed by The American National Bank. As a consequence a contract was prepared by the attorney for The American National Bank, submitted to meetings of the boards of directors of the respective banks, held in the early morning of July 15, and, after having been unanimously approved by both of said boards, was duly executed by the respective executive officers of the two institutions.

This contract, which is the subject of this litigation, provided, among other things, that The First National Bank (party of the first part) "* * * doth hereby sell, transfer, assign, deliver and set over unto the party of the second part [The American National Bank] all of its property, whether real, personal or mixed, including the building at present occupied by it as its banking house, and furniture and fixtures therein, and more particularly all the notes, bills, bonds, stocks and other evidences of debt whether now in the possession of the party of the first part or pledged by it for its obligations, a list of said property being attached hereto as a part of this agreement; and the said party of the first part, through its board of directors, hereby authorizes and directs its officers to turn over and deliver unto the party of the second part all of the notes, accounts, bills receivable, and all items that have been charged off, and all property of every kind and description now in the possession of the party of the first part, and further authorizes the said party of the second part to collect all of the moneys due upon the assets of the said party of the first part and apply the proceeds of such collections to the payment of the obligations of the said party of the first part, upon complete liquidation and full payment to the said party of the second part of all liability assumed under this agreement, together with the costs of liquidation, including all costs incident thereto, and all attorney's fees, paid or assumed in the liquidation, the balance, if any, shall be prorated among the stockholders of the party of the first part according to their respective rights and interests.

"In consideration of the foregoing the party of the second part hereby agrees to take over and receive the property hereinabove conveyed and to use all reasonable care and diligence in realizing upon the said assets and in making sale of said properties and in using the moneys realized therefrom for the payment of the said obligations of the party of the first part, to-wit: All notes, bills payable, and obligations of the party of the first part to its depositors, but excepting any obligations to its stockholders, but nothing in

this agreement shall be construed as relieving the stockholders of their individual double obligations as provided by the United States Revised Statutes [12 U. S. C. A. sections 63, 64].

\* \* \* \* \* \* \*

"It is further agreed that the said party of the second part shall classify the assets in two classes, placing in the first class those assets it deems collectible and in the other class those assets of doubtful value, and that The First National Bank will execute a demand note payable to The American National Bank for an amount equal to the difference between the assets placed in the first class and the amount of the total of the liabilities assumed; such note to be *collateral* by all assets placed in the second class and the party of the second part shall have the right at all times to exchange any assets placed in the first class for any placed in the second class and *vice versa.*"

Immediately after the execution of the contract the executive officers of The First National Bank, upon the demand of The American National Bank, executed and delivered to the latter a demand note in the principal sum of $2,229,-641.33, which represented the total liabilities of The First National Bank as of July 15, 1929, less only its cash on hand and that due from other banks. This note stated on its face that it was secured by all of the remaining assets of The First National Bank.

Thereupon all of the property of every sort of The First National Bank was turned over and delivered to The American National Bank. The liquidation began immediately and continued until October 7, 1932.

On July 15, 1929, The American National Bank inserted in the public press an announcement that effective on that day it had "purchased the assets and assumed all liability to the depositors of the First National Bank."

In a letter dated July 19, 1929, addressed to the stockholders of The First National Bank and signed by the directors of that institution, the stockholders were told:

"The assets of your bank will be liquidated, paying first all liabilities except to stockholders. After this is done the overplus will be paid to the stockholders of your bank from time to time.

"The American National Bank will liquidate the assets of your bank without cost to the stockholders, except in the event of suits, in which case only the actual cost in connection therewith will be *charges* against your assets. A committee from the stockholders of your bank will co-operate with the American National Bank in the handling of your assets."

On July 25, 1929, a letter was sent out over the signatures of the executive officers of The American National Bank, on its stationery, to every stockholder of The First National Bank, containing these statements:

"This is to confirm our purchase of all the assets of the First National Bank and the assumption of all liabilities except to stockholders. * * *

"It was a most unfortunate occurrence for the First National Bank to have been the victim of such circumstances, for it was a solvent bank—had it not been we could not have taken it over."

Butler Ballance, who had been cashier of The First National Bank until July 15, 1929, was, on that date, employed by The American National Bank, as a clerk, to handle the liquidation under the direction and supervision of the officers and directors of The American National Bank. He so continued throughout the liquidation.

At a meeting of the stockholders of The First National Bank, commenced on January 14, and concluded on January 24, 1930, "The action of the board of directors in their disposal of the affairs of the First National Bank to the American National Bank and the contract entered into thereby" were ratified. It was further resolved that the bank be placed in voluntary liquidation, and Butler Ballance, its former cashier, was appointed liquidating agent under the supervision of the board of directors. Provision was made for the necessary reports by the liquidating agent to the

Comptroller of the Currency, showing the progress of the liquidation until its completion, and for a report to the shareholders at their next annual meeting.

Pursuant to this authority Mr. Ballance, although in the employ of and paid by The American National Bank, assumed the position of liquidating agent of The First National Bank, and so continued until its affairs were fully liquidated and wound up, making the reports provided for in the resolution appointing him, as well as reports from time to time to the board of directors of The First National Bank.

On October 7, 1932, the balance due and unpaid on the note of $2,229,641.33 had been reduced to $472,126.16. On that date, after advertisement in the local press, the remaining assets of The First National Bank, having a face value of $546,823.79, were sold in bulk by The American National Bank and purchased by itself for the sum of $172,000. After applying the purchase price on the note there remained an unpaid balance of $300,126.16,—almost the precise amount of the paid-up capital stock of $300,000 of The First National Bank.

This action was reported to a meeting of the directors of The First National Bank, held on October 13, 1932, when they were informed by The American National Bank that liquidation had been completed; that this sale and purchase had created a deficit of $300,126.16 in the satisfaction of the liabilities of The First National Bank; and that accordingly the shareholders of the latter bank would be assessed 100% on their holdings of stock. They were advised, further, that the shrinkage of the assets of The First National Bank during liquidation had amounted to more than $750,000.

Shortly thereafter The American National Bank presented to the Comptroller of the Currency the note for $300,126.16, alleging that it was a valid obligation of The First National Bank, and demanding that the stockholders of the latter bank be assessed 100% on their holdings of capital stock. The Comptroller, acting *ex parte,* allowed the note as a

valid debt of The First National Bank and levied the assessment accordingly.

Being dissatisfied with this meager announcement of the disastrous outcome of the liquidation, certain of the stockholders of The First National Bank demanded of The American National Bank a statement of the details of the liquidation, reasons for the alleged shrinkage in the assets, and how the resulting alleged deficit was created. They were given no accounting and no further explanation.

Thereupon a number of the stockholders of The First National Bank, suing on behalf of themselves and all other stockholders, filed their bill against The American National Bank praying that the contract between the two banks be construed; that the note, originally given for $2,229,641.33 and on which there was an alleged balance due of $300,126.-16, be cancelled because not in accordance with the contract; that the sale of the assets by The American National Bank to itself be set aside; and that the latter bank be required to render an accounting of the disposition of the assets and property which had come into its hands under the contract.

A demurrer filed by The American National Bank to this bill was sustained by the lower court. On appeal we reversed the decree of the lower court and remanded the case for a hearing on its merits. *Ames* v. *American Nat. Bank,* 163 Va. 1, 176 S. E. 204.

Subsequently an amended bill was filed, and to this The American National Bank filed an answer. The cause was referred to a special master who, after numerous hearings at which voluminous testimony was taken, filed a report in which he found that the note for $300,126.16 (representing the balance due on the note of $2,229,641.33) should be cancelled, the sale set aside, and that upon an accounting The American National Bank owed The First National Bank the sum of $197,501.91, with interest from October 7, 1932.

Exceptions were filed by The American National Bank to this report, on the hearing of which the chancellor handed down an opinion sustaining the special master's report in all

essential respects. The chancellor, however, sustained certain exceptions to the report, the effect of which was to reduce the amount found due by The American National Bank to $169,105, with interest from October 7, 1932. From a decree entering judgment against it for that amount and interest, The American National Bank has appealed.

■ Since the interpretation placed by us on the contract on the first appeal has become the law of the case, and in view of the fact that much of the argument of the appellant, The American National Bank, runs counter thereto, it is necessary that we keep clearly in mind just what we have previously decided.

On the first appeal we held the true meaning of the contract to be this (163 Va. 1, at pages 40-43, 176 S. E. 204, at pages 217, 218) :

(1) The First National Bank transferred and conveyed to The American National Bank all of its assets except its corporate franchise, and in consideration thereof The American National Bank assumed and agreed to pay all liabilities of The First National Bank (other than its liability to its stockholders as such), regardless of whether the assets were sufficient for that purpose or not.

(2) The American National Bank was obligated within a reasonable time after the execution of the contract to divide all of the assets of The First National Bank into two classes, collectible and doubtful. Collectible assets were defined as money on hand and notes "matured or maturing within a reasonable time which the American National deems worth their face value."

(3) While the making of this classificaton is left to the judgment of The American National Bank, the contract implies that it "shall be made honestly and fairly in the light of the facts as they *then* [July 15, 1929] shall be known or appear."

(4) "When such classification shall have been made, the First National shall execute its demand note payable to the American National Bank for an amount equal to the difference between the total amount of the liabilities of the

First National assumed by it and the assets placed in the first class; and the amount so arrived at shall constitute the maximum of any liability that the First National shall be liable to the American National under this contract or by reason of its having assumed or paid off the First National's liabilities."

(5) "The assets placed in the first class shall become and be the absolute property of the American National,"—that is to say, they are then and there purchased by The American National Bank at their face value. "The assets placed in the second class shall be collateral or security for the payment of the liability evidenced by the note to be given."

(6) "The American National shall use all reasonable care and diligence to collect or otherwise realize upon the assets transferred to it."

(7) The proceeds derived from the assets of the first class are the property of The American National Bank.

(8) The proceeds derived from the assets in the second class are to be applied, as and when received, to the expenses of liquidation and to the payment of the note, and the surplus, if any, to the stockholders of The First National Bank in proportion to their shareholdings.

We further said: "If the American National failed to make the required classification * * *, no officer acquired authority by virtue of this contract to execute the note therein provided for; and the First National or its stockholders have the right to come into a court of chancery and have the note cancelled, unless it has become estopped to do so." (163 Va. 1, at page 46, 176 S. E. 204, at pages 219, 220.)

And we also held that The American National Bank would not be permitted to gain an advantage from its wrongful failure to comply with the provisions of the contract, "unless the First National has acquiesced in or is estopped from complaining of the failure." (163 Va. 1, at page 47, 176 S. E. 204, at page 220.)

The first and principal assignment of error is that the trial court should have held that under the evidence the

stockholders of The First National Bank had acquiesced in the failure of The American National Bank to make the required classification and in the giving of the note of $2,-229,641.33, and were, therefore, estopped to question the validity of the said note.

It is the contention of the appellant, as stated in its petition for appeal, that the evidence shows that "Whatever was done by the officers of both banks in making the note and liquidating the assets was fully known to the officers, directors and stockholders of the First National Bank and they fully acquiesced therein and thereby became estopped."

■■ It is elementary that estoppel will never lie unless the party against whom it is invoked had full knowledge of his rights and all the material facts and circumstances of the case. He can not waive or acquiesce in a wrong when ignorant of its existence. He can not ratify an act unless he knows it has been done. The burden of proving that a person has full knowledge of his rights and that he intends to waive them is upon the party who asserts estoppel or ratification as a defense. And such knowledge must be clearly and plainly shown. *Millboro Co.* v. *Augusta Corp.*, 140 Va. 409, 417, 125 S. E. 306; *Blanford* v. *Trust Co.*, 142 Va. 73, 82, 83, 128 S. E. 640; *Parker* v. *Inge*, 157 Va. 592, 600, 161 S. E. 884; *Wilson* v. *Carpenter's Adm'r*, 91 Va. 183, 192, 21 S. E. 243, 50 Am. St. Rep. 824.

■ The question, then, is whether The American National Bank has borne this burden of proof and has clearly and plainly shown that the stockholders of The First National Bank had knowledge of the existence of the note in question. Both the special master and the chancellor have found that this burden of proof has not been sustained. Under familiar principles while such finding, being based on depositions, is not binding upon us, it is entitled to great weight and will not be lightly disturbed. *Shield* v. *Brown*, 166 Va. 596, 186 S. E. 33; *First Nat. Bank* v. *Weinberg*, 165 Va. 433, 182 S. E. 250; *Crump* v. *Bronson*, 168 Va. 527, 191 S. E. 663.

Under the contract the amount of the note was to be determined by the classification. Until this had been made the amount of the note, or whether any note at all should have been required, was impossible of determination. The note was demanded and received at four o'clock in the morning. Only Ogburn, the executive vice-president, and Ballance, the cashier, who executed the note on behalf of The First National Bank, were present representing that bank.

Ogburn testified that he understood that the note then executed by him was a temporary proposition for bookkeeping purposes and was to be replaced by another for the correct amount to be determined by the classification of the assets in accordance with the contract. We think this was a natural deduction under the circumstances. Since The American National Bank had assumed the debts of The First National Bank, and thereby increased its liabilities *pro tanto,* an offsetting entry was necessary in its assets in order that its books might balance. Instead of undertaking to list in detail the various assets which it had acquired from The First National Bank (even assuming that this could have been done within the time at hand), The American National Bank simply demanded, as a temporary matter, a note for the difference between the liabilities assumed and the cash on hand, which difference, as we have seen, amounted to $2,229,641.33.

The testimony of Ballance, the former cashier of the First National Bank, and of Amrhein, the national bank examiner who was assisting in the transfer, both of whom were called as witnesses for The American National Bank, is to the same effect.

Just why a proper classification was not made and a note for the correct amount was not given does not satisfactorily appear from the record. The testimony of Mr. Lawrence is that he deemed only the cash in bank to be a collectible asset, and that when he required a note for the difference between this and the liabilities assumed, he thought it was a compliance with the contract. This, as we have already

seen, is contrary to the holding of this court on the former appeal.

The American National Bank claims that in any event the existence of the note and the manner in which the assets were being liquidated were brought to the knowledge and attention of the directors and stockholders at various meetings.

It is said that Ballance testified that the note was discussed at the stockholders' meetings held in January, 1930. But this witness admitted on cross-examination that this was merely a surmise on his part and was based upon the fact that the minutes of the meetings showed "that Mr. Ogburn had made a very comprehensive and explanatory report of the circumstances and conditions resulting in the sale by contract of the assets and liabilities of the First National Bank," which he thought necessarily included a report of the note. But Ogburn is positive in his testimony that he did not mention the note at these meetings.

It is true that Ogg, a witness for The American National Bank, was unshaken in his testimony that the note was mentioned there.

On the other hand four directors and six other stockholders of The First National Bank testified positively that the note was not mentioned at this or at any other directors' or stockholders' meeting.

For instance, Harry A. Brinkley, Esquire, a member of the Portsmouth bar, and counsel for The First National Bank, who was present at the stockholders' meeting held in January, 1930, testified that he knew nothing of the existence of the note until the institution of this suit.

Certainly neither the minutes of this meeting nor of any other meeting of the directors or the stockholders make any mention of this note.

We thus see that the overwhelming weight of the evidence is that the note in question was not discussed or even specifically mentioned at any of the stockholders' meetings.

The next contention of the appellant is that at each of the meetings of the stockholders, held respectively in January, 1930, and in January, 1931, there were read condensed statements of the condition of The First National Bank, in which appeared an item of "bills payable." For instance, the statement of the condition of the liquidating bank, as of December 31, 1929, showed an item, "bills payable $1,700,000." There is testimony that in banking circles these words represented money due by the institution on its note or notes. It is, therefore, argued that the words "bills payable" in these statements were sufficient to put the stockholders on notice of the existence of the note in question.

But a number of the directors and stockholders of The First National Bank testified that they did not understand that these words, "bills payable," referred to any note or notes due by their bank.

And there is direct and uncontradicted testimony that at the stockholders' meeting held in January, 1930, Ballance told those present that the words "bills payable," as used in the statement, represented the remaining amount of liabilities of The First National Bank, which had been assumed by The American National Bank and which must be covered by collections from assets before any surplus could accrue to the stockholders of The First National Bank for distribution. There was no suggestion that the words represented the balance due to The American National Bank on a note made and signed by The First National Bank.

We can not say that under the circumstances disclosed by the record the trial court was in error in holding that the mere presence of the words "bills payable" in the statements presented to the stockholders was insufficient to prove that the stockholders knew of the existence of the note and, therefore, had ratified and approved it.

Another convincing circumstance showing that the stockholders of The First National Bank knew nothing whatever about the note is what occurred at an informal meeting of a group of them held in December, 1931. This meeting was

called upon notification that an assessment against the stockholders of The First National Bank was contemplated. They consulted counsel with regard to the matter and procured the attendance at the meeting of Mr. Ballance, who was employed by The American National Bank in the collection of the assets during the whole period of liquidation and therefore thoroughly familiar with all of the facts involved in it. At this meeting Ballance was specifically interrogated as to the basis of any claim of liability against the stockholders. No one else present knew of the existence of the note. Reference was made to the fact that the stockholders had been assured in writing that their bank was solvent. When Ballance was appealed to, as one familiar with the whole transaction, to tell these stockholders upon what their supposed liability was predicated, he said he did not know, and made no mention of the note. On the stand Ballance's explanation of his failure to mention the note at that time is that he "presumed that they knew it."

We are convinced from a careful reading of the record that the first time the stockholders really became aware of the existence of the note was in a conference held on November 28, 1932, between counsel representing the stockholders and the executive officers of The American National Bank. This was after the liquidation had been completed.

Great reliance is placed by The American National Bank on the fact that the term "bills payable" appears in the reports of the progress of the liquidation made to the board of directors of The First National Bank from time to time. The same is true of the reports made to the Comptroller and signed in each instance by three directors. It is argued that certainly the directors of the bank must have known that the term "bills payable" included "notes payable"; that knowledge of the directors was knowledge of the bank; and that acquiescence by the directors in the giving of the note was acquiescence by the bank, which was binding on the stockholders.

Particular emphasis is placed upon the report of the condition of The First National Bank as of July 13, 1929, which

is signed by Ballance as liquidating agent, and by five of the directors as a liquidating committee. In the lower left-hand corner of the sheet, beneath Ballance's signature, is the following note in his handwriting: "Assets in hands of liquidating agent lodged with the American National Bank of Portsmouth for collection and as collateral for a demand note of $2,229,641.33, dated July 15, 1929, and signed by The First National Bank of Portsmouth, Va." It is argued that certainly this report carried actual notice of the existence of the note to the five directors who signed it as a liquidating committee, and through them to the stockholders, whom they represented. Ballance testified that although dated July 13, 1929, this report was actually prepared by him either in March, or April, 1930.

But it must be remembered that upon the execution of the contract on July 15, 1929, The First National Bank ceased to be a going concern and was in liquidation. Neither its officers nor its directors could thereafter do anything to alter or add to its obligations or liabilities. The stockholders, in a meeting assembled, had authorized a liquidation of the bank, under the supervision of the directors, in accordance with the terms of the contract which was specifically approved. They did not authorize the changing of the contract in any respect. Since it was beyond the power of the directors to change the contract by formal, direct action, certainly they could not accomplish the same result by acquiescing in any attempt on the part of The American National Bank to effectuate the same end. See *Richmond* v. *Irons*, 121 U. S. 27, 60, 7 S. Ct. 788, 30 L. Ed. 864; *Schrader* v. *Manufacturers' Bank*, 133 U. S. 67, 77, 10 S. Ct. 238, 33 L. Ed. 564; *Derscheid* v. *Andrew*, 8 Cir., 34 F. (2d) 884, 887; *Richards* v. *Attleborough Nat. Bank*, 148 Mass. 187, 19 N. E. 353, 356, 1 L. R. A. 781.

And there is, we think, another conclusive answer to the appellant's claim of estoppel here. It is well settled that the doctrine of estoppel can never be applied except where the party who invokes it shows clearly that in reliance upon the conduct or silence complained of he has been mis-

led to his injury. *County School Board* v. *First Nat. Bank,* 161 Va. 127, 138, 170 S. E. 625; *Cary* v. *Northwestern Mutual Life Ins. Co.,* 127 Va. 236, 246, 103 S. E. 580; *Smith's Ex'r* v. *Powell,* 98 Va. 431, 436, 36 S. E. 522.

■ This necessary element is entirely lacking in the present case. There is no claim that the appellant has been in any way misled to its injury by reason of the alleged acquiescence of The First National Bank or its stockholders. On the contrary we have the positive and direct testimony of the executive officers of The American National Bank that they followed the course pursued by them because they thought the contract gave them the right to do so, and not because of anything The First National Bank or its stockholders did or failed to do. Indeed, they say they would have changed their course in no particular even if there had been a protest from the other bank or its stockholders.

■ We think the trial court was right in holding that the stockholders were not estopped to deny the validity of the note. It follows from what we said in the former opinion in this case that the note must be cancelled and the assets classified by the court in accordance with the contract and as of its date, to-wit, July 15, 1929.

The next assignment of error is that the classification which was made by the special master, as of July 15, 1929, and approved by the chancellor, is improper.

Despite our holding to the contrary, The American National Bank insisted in its answer subsequently filed, and through the testimony of its executive officers before the special master, that it was justified in classifying as "collectible" only the cash in bank, amounting to $184,108.43, and that all of the notes of the closed bank, having an aggregate face value of $2,093,858.18, should be without exception classified as being of "doubtful" value. This is the only classification The American National Bank ever offered to the special master.

The basis of the classification made by the special master was the report of the examination of The First National Bank made by Amrhein, national bank examiner, on April

15, 1929. This was the last examination made before the execution of the contract on July 15, 1929.

A condensed statement of this report follows:

### RESOURCES

| | | |
|---|---:|---:|
| Loans and discounts | $2,160,288 | 06 |
| Overdrafts | 264 | 72 |
| Government bonds | 320,000 | 00 |
| Bonds, stocks, and securities | 359,692 | 75 |
| Banking house, furniture, and fixtures | 136,067 | 47 |
| Other real estate | 55,115 | 23 |
| Due from Federal Reserve Bank | 89,893 | 48 |
| Cash and due from banks | 208,943 | 86 |
| Redemption fund with U. S. Treasury | 15,000 | 00 |
| Other assets | 1,922 | 49 |
| | $3,347,288 | 06 |

### LIABILITIES

| | | |
|---|---:|---:|
| Capital stock paid in | $ 300,000 | 00 |
| Surplus | 100,000 | 00 |
| Undivided profits | 45,480 | 74 |
| Reserved for depreciation, losses, interest, and taxes | 46,800 | 00 |
| Circulating notes outstanding | 296,300 | 00 |
| Due to banks | 94,652 | 45 |
| Deposits | 2,211,560 | 63 |
| Bills payable and rediscounts | 241,500 | 00 |
| Bills of exchange or drafts endorsed | 1,922 | 49 |
| Other liabilities | 9,071 | 75 |
| | $3,347,288 | 06 |

Among the loans and discounts Amrhein listed $62,801.59 as doubtful, and $32,523.80 as a loss. All of the others he classified as collectible as of April 15, 1929. Of the total collectible notes the report listed $507,084.27 as being slow.

Although called as a witness for The American National Bank, Amrhein vouched for the accuracy and correctness of this report. It appeared that he had been examining The First National Bank for six years and was thoroughly familiar with its paper. Likewise, both Ballance and Ogburn, respectively cashier and executive vice-president of The First National Bank, testified to the accuracy of the report. Indeed, its accuracy is not challenged by the appellant.

The complainants below introduced evidence (which was in no way impeached or contradicted) that of the notes classified as collectible by Amrhein, as of April 15, 1929, only $27,300 had become doubtful between the date of the report and July 15, 1929. All except about $5,000 of the notes classified by Amrhein as a loss had been charged off by the latter date. In other words, this evidence carried down to July 15, 1929, Amrhein's report with reference to all paper which was in the bank on April 15, 1929.

Between April 15 and July 15, 1929, The First National Bank discounted new paper aggregating $367,927.97. The testimony of two experienced bankers in Portsmouth was taken with respect to the collectibility of each of such notes as of July 15, 1929. These witnesses classified only $24,-815.70 as doubtful, and of this amount all except approximately $7,000 was actually collected during the liquidation.

On the basis of this testimony the special master classified the loans and discounts as of July 15, 1929, as follows: Collectible notes, $1,873,534.94; doubtful notes, $220,323.24; total, $2,093,858.18.

Deducting from the total of liabilities assumed, $2,229,-641.33, the sum of the collectible notes, $1,873,534.94, there remains a balance of $356,106.39. The special master found this to be the correct amount for which, under the former opinion of this court, The First National Bank was obligated to indemnify The American National Bank, and for which the note should have been given.

This classification, confirmed by the trial court, is vigorously assailed by The American National Bank.

First, it is said that even if the national bank examiner's report of the condition of the bank, as of April 15, 1929, be admissible as a proper basis for the classification, the lower court erred in classifying only $220,323.24 of the notes as doubtful. It is argued that notes in the additional amount of $507,084.27, which were found by the examiner to be slow on April 15, 1929, should have been classified by the special master as doubtful, and that if this be done then The

First National Bank was insolvent at the date of the bank examiner's report.

If that argument be sound then The First National Bank should have been closed by the national bank authorities on the basis of that report. That it was allowed to remain open shows that these officials placed no such interpretation on the report.

It is interesting to note that if this same test were applied to The American National Bank, it was likewise insolvent on the same date, for its statement showed that it had on hand slow paper amounting to more than $700,000.

We find in the record no sound basis for the argument that the special master should have classified all slow paper as doubtful. As several of the witnesses pointed out, the terms are not synonymous. A note might be classified as slow because the maker had failed over a period of time to substantially curtail it, and yet it might prove to be collectible if payment were demanded or if the collateral were resorted to.

The American National Bank next contends that the national bank examiner's report of April 15, 1929, was not admissible in evidence, and that the complainants should have proved the collectibility of the notes sought to be classified by showing the ability to pay of the maker of each and every one of them as of July 15, 1929.

With this contention we can not agree. The report was made by the examiner in the course of his official duties and was supplemented by his own statement on the witness stand as to its accuracy. We think it was admissible in evidence and at least made out a *prima facie* case of the correctness of the matters therein set forth.

In the recent case of *Jeffreys* v. *O'Neal,* 4 Cir., 64 F. (2d) 284, 288, Judge Soper, speaking for the court, said:

"The report of an experienced national bank examiner concerning the condition of a bank which he has examined should furnish the most reliable evidence of the true situation, and such a summary, supported by the evidence of the man who made it, and by the production of the

books and papers upon which it was based, may be offered in evidence in strict accordance with recognized rules."

See also, *Richards* v. *Robin,* 178 App. Div. 535, 165 N. Y. S. 780, 784, and authorities there cited.

In *Coleman* v. *Commonwealth,* 25 Gratt. (66 Va.) 865, 881, 882, 18 Am. Rep. 711, we held that a record or report made by an officer in pursuance of a public duty is evidence *per se* of what it contains.

Then, too, all of the credit files of The First National Bank came into the possession of The American National Bank upon the execution of the contract. These were destroyed by the direction of the executive officers of The American National Bank in July, 1933, when the banking house of the defunct bank was sold. This was while the present suit was pending. The American National Bank should have known that these records might have been required. To say the least, it is hardly in a position to criticize its opponents because such evidence could not be produced.

On the evidence disclosed in the record we think the trial court was right in confirming the classification made by the special master.

Assignment of error Number 4 complains of the action of the chancellor in charging the appellant with $79,416.37, representing the loss resulting from its failure to promptly sell forty-seven items of listed bonds, of the par value of $345,000, which were among the assets which The American National Bank held as collateral for the indemnity note.

The uncontradicted evidence is that on August 15, 1929, thirty days after the execution of the contract, these bonds had a market value of $305,581.35. Only thirteen out of the forty-seven items of bonds were sold during the first eighteen months of liquidation. These were all sold on the open market. Except for two other items sold on the open market, all of the remainder of the bonds were sold by The American National Bank to itself, the large majority of them on May 24, 1932, a date within one week of the lowest point of the bond market since July 15, 1929. By that time

the bonds had declined to a point where they had lost more than 75% of their cost price.

The trial court held The American National Bank liable for $79,416.37, being the difference between the admitted value of the bonds as of August 15, 1929, and the price at which they were actually sold.

Under the contract The American National Bank covenanted to "use all reasonable care and diligence in realizing upon said assets and in making sale of said properties and in using the moneys realized therefrom for the payment of the said obligations of the party of the first part."

The American National Bank did not hold these bonds merely as security for the note. Under the contract it was a trustee for the purpose of selling them promptly and applying the proceeds to the payment of the debt.

These securities under consideration were listed and quoted daily on the stock exchange and in the bonding houses of the country. They could have been sold by The American National Bank as soon as they were received. It had no right to hold them for a period of nearly three years, hoping in the face of a declining market that they might increase in price, but fully realizing that they might depreciate even further. Under the terms of the contract they should have been sold within a reasonable time, the limit of which the trial court fixed, under the evidence, at thirty days from the date they were received.

It is well settled that where a trustee, charged with the duty of converting securities into cash within a reasonable time, negligently or improperly delays to do so, he is liable for the loss suffered by the trust estate. See Restatement of the Law, Trusts, vol. 1, p. 575, sec. 209; 3 Bogert's Trusts and Trustees (1935 Ed.), p. 2086, sec. 705; *In re Pinney's Estate,* 156 Misc. 844, 282 N. Y. S. 680; *Cameron Trust Co.* v. *Leibrandt,* 229 Mo. App. 450, 83 S. W. (2d) 234.

Nor can The American National Bank escape liability under this count by pleading that in delaying the sale of the bonds it was acting on the advice of Mr. Ogburn, one of the former executive officers of the defunct bank. Under

the contract the obligation was upon The American National Bank, and not upon Mr. Ogburn, to convert these assets into cash. As a matter of fact, according to Mr. Ogburn's uncontradicted testimony, he was not consulted about the sale of the bonds until about September 1, 1929, after the time had expired during which the trial court held that the bonds should have been sold.

We think the trial court was clearly right in holding The American National Bank liable for the loss due to the delay in the sale of these bonds.

The same principles apply to the seventh assignment of error, which deals with the loss of $2,012.50 by reason of the delay in the sale of certain Hygrade Food Products stock.

Assignment of error Number 5 complains of the action of the lower court in setting aside the sale which The American National Bank made to itself on October 7, 1932, of assets of the face value of more than $546,000, for the price of $172,000.

The American National Bank attempts to justify this sale by saying that the terms of the collateral note, which it obtained from The First National Bank, contained a provision permitting the holder thereof to sell and purchase these assets thereby pledged.

In our opinion on the former appeal we held that there was nothing in the contract between the parties which authorized either the execution of a note containing such provisions, or the sale of these assets by the bank to itself, and that consequently the sale should be set aside. What we said there, of course, became the law of the case and needs no further comment.

It may be said, however, in passing, that the evidence since taken and incorporated in the present record fortifies our views with respect to this transaction.

In June, 1932, the board of directors of The American National Bank authorized a private sale of these assets for the sum of $425,000. On the following October 7th, it purchased them from itself for the sum of $172,000. On the very day of this sale an executive officer of The American

National Bank wrote the chief national bank examiner a letter, approved by the board of directors, in which he stated that the bank hoped to realize out of the assets just purchased at least $140,000 more than it had paid for them.

This was a flagrant breach of trust on the part of the bank, which had covenanted in the contract to "use all reasonable care and diligence to collect or otherwise realize upon the assets transferred to it." It was a conversion of the trust estate, by reason of which The American National Bank became liable to account for the value of such assets as of the date of the sale. 65 C. J., p. 697, sec. 562; *Cushman* v. *Bonfield,* 139 Ill. 219, 28 N. E. 937; *In re Hart's Estate,* 203 Pa. 488, 53 A. 367.

Included among the assets unlawfully purchased by the bank from itself at such sale were notes of the face value of $60,757.67, which the special master and the lower court charged to the bank at this figure. Since the special master found that these notes, if handled properly, would have been classified as doubtful, the action of the lower court in charging them to the bank at their face value is the subject of another assignment of error.

It is well settled that the measure of damages for the conversion of commercial paper is *prima facie* the face value of the converted instrument. The person guilty of conversion may show that the actual value is less than the face value of the instrument, but the burden is on him to do so. 26 R. C. L., p. 1150, sec. 65, and cases cited; 65 C. J., pp. 151, 152, sec. 277; *First Nat. Bank* v. *Ransford,* 55 Ind. App. 663, 104 N. E. 604, 605, 606; *Citizens Bank* v. *Shaw,* 132 Ga. 771, 65 S. E. 81.

Just what became of these notes and what was realized thereon was information exclusively within the knowledge of The American National Bank. Before the special master it refused to account for them and contented itself with the assertion that the sale of them to itself was valid, the opinion of this court to the contrary notwithstanding. If the notes were worthless or uncollectible, evidence to prove this should have been produced by the bank.

Failure to do so raises the inference that no such evidence existed.

Furthermore, it appears that on August 11, 1932, less than sixty days before the sale, there had been a drastic charge-off of notes not theretofore collected. The items making up the $60,757.67 of notes in question survived this charge-off. Doubtless if the notes had been worthless, as the bank now claims, they would have been charged off at that time.

Complaint is made of the action of the chancellor in charging The American National Bank with certain real estate at its assessed value of $27,700. This property was included among the assets which the bank unlawfully attempted to sell to itself on October 7, 1932.

No objection was offered to the introduction of evidence of the assessed value of the property before the special master, and no evidence contradictory thereof was produced by the bank. Under these circumstances we need not pass on the admissibility of such evidence as an original proposition. Under familiar rules such objection can not be made here for the first time. Rule XXII. See also, *Newberry* v. *Watts*, 116 Va. 730, 736, 82 S. E. 703; *Jeffress* v. *Virginia Railway & Power Co.*, 127 Va. 694, 732, 104 S. E. 393; *City of Richmond* v. *Cheatwood*, 130 Va. 76, 87, 107 S. E. 830.

Complaint is made that the chancellor failed to allow as a credit to The American National Bank interest on the indemnity note.

The evidence shows that there was an aggregate interest charge of more than $225,000 on the note which was taken for the principal sum of $2,229,641.33. But since we have found that the note should have been for only $356,106.39, the major portion of the interest item goes out.

Under the contract the note was given to indemnify The American National Bank against any loss it might suffer by reason of having assumed the liabilities of The First National Bank. There was no provision in the contract for charging interest on the note.

It is uniformly held that there can be no recovery on an indemnity obligation where there has been no actual loss or damage. 14 R. C. L., p. 55, sec. 13; 29 Ann. Cas. p. 1152, note.

Here The American National Bank suffered no damage by reason of its undertaking. The uncontradicted evidence is that it collected from the assets of the defunct bank, within thirty days of the date of the contract, more money than it was compelled to expend or pay out on account of the obligations assumed. And we have seen that in the final result of the liquidation it collected from the assets, which were properly classifiable as having been lodged with it as security, more than enough to discharge the full amount of the note that it had the right to require of The First National Bank.

Assignment of error Number 16, for the first time, challenges the jurisdiction of the State court to hear this litigation.

In support of this contention the appellant cites U. S. C. A. title 28, sec. 41 (16), which gives to the District Courts of the United States exclusive jurisdiction in suits for winding up the affairs of a national bank. Argument is made that because The First National Bank was in liquidation at the time this suit was brought, it is an action for winding up that bank's affairs within the purview of this section.

But this is in no sense a proceeding for winding up the affairs of The First National Bank. It is a suit in equity against The American National Bank, a going concern, for the cancellation of a note which it illegally obtained from The First National Bank, and for an accounting of its transactions with that bank under the contract of July 15, 1929.

U. S. C. A. title 12, sec. 94, gives to the appropriate United States District court and to the appropriate State court concurrent jurisdiction of actions of this character against a national bank.

On the first appeal we held that the stockholders of The First National Bank were entitled to bring this suit in their

own names because they are primarily bound by reason of their statutory liability as principal debtors upon such note as The First National Bank should have given to The American National Bank.

 The mere fact that a receiver had been appointed for The First National Bank did not, we think, deprive the State court of jurisdiction to interpret the contract and to require of The American National Bank, a going concern, an accounting of its transactions thereunder. See *First Nat. Bank of Bethel* v. *National Pahquioque Bank,* 14 Wall. (81 U. S.) 383, 395, 20 L. Ed. 840.

None of the remaining assignments of error presents any novel question. Consequently we will not prolong this opinion by a discussion of them. Suffice it to say that we have carefully examined each and find none to be well taken.

The main assignment of cross-error relates to the disallowance by the lower court of two interest items of $11,-766.60 and $3,871.71, a total of $15,638.31, which the special master had found due by The American National Bank.

The first of these items is accrued interest on the notes of $60,757.67. We have already found that The American National Bank was guilty of the conversion of these notes in the unlawful sale of them to itself on October 7, 1932, as a result of which it became chargeable with the face value thereof.

The special master found that The American National Bank should be charged not only with the principal of these notes but also with accrued interest thereon to the date of sale, amounting to $11,766.60. The trial court disallowed the interest item.

 This, we think, was error. The face value of an interest-bearing note, as of a given date, is the principal thereof and interest accrued thereon to such date. Accordingly all of the authorities hold that the measure of damages for conversion of a promissory note is *prima facie* the face value of the note,—that is, the principal plus accrued interest. *Hayes* v. *Massachusetts Mutual Life Ins. Co.,* 125

Ill. 626, 18 N. E. 322, 327, 1 L. R. A. 303; *Hersey* v. *Walsh,* 38 Minn. 521, 38 N. W. 613, 8 Am. St. Rep. 689; *Booth* v. *Powers,* 56 N. Y. 22; *First Nat. Bank* v. *Ransford,* 55 Ind. App. 663, 104 N. E. 604, 605; *Healey* v. *Flammia,* 96 Conn. 233, 113 A. 449, 450.

If the actual value of the notes was less than their face value,—that is, if any part of either the principal or interest had been paid,—this was a matter of defense which The American National Bank had the right to show. But the burden of proof was on it to do so. Such information was entirely within the knowledge of that bank. It can not complain if the record fails to show whether or not any part of this interest has been paid.

The next item of $3,871.71, found due by the special master and disallowed by the trial court, arose in this manner: The American National Bank admitted that it had collected during the liquidation $59,974.76 of notes, which the special master found were classifiable as doubtful as of July 15, 1929. The accounts of The American National Bank failed to show just when these notes had been paid and how much interest had been collected thereon. Instead of charging The American National Bank with interest on them for the entire period of liquidation, extending over a period of more than three years, which interest would have amounted to $11,615.12, the special master arbitrarily charged it with only one-third of that amount, to-wit, $3,871.71. His reason for doing so was that he estimated that these notes were probably fully collected within the first year or two of the liquidation.

The effect of the ruling of the trial court in disallowing this item of $3,871.71 was to penalize The First National Bank because The American National Bank had failed to keep the records of liquidation in such a shape as to be able to render a proper accounting to the court. This was error.

If a trustee handles his trust affairs in such a manner as to be unable to render a proper accounting, he, and not the *cestui,* should suffer. Certainly The American Na-

tional Bank is not in a position to criticise the special master for estimating that the collections were made by it during the first year of the liquidation and not in the third. If any error has been committed with respect to this item it was in favor of The American National Bank.

Accordingly, we think the trial court erred in disallowing the two interest items aggregating $15,638.31.

Another assignment of cross-error is directed to the action of the trial court in finding that twenty-five shares of stock of the Portsmouth Improvement Company, a part of the assets delivered by The First National Bank to The American National Bank, were worthless. The special master had placed a value of $2,500 on this stock.

This presents a pure question of fact. The trial court carefully reviewed the pertinent evidence in the light of local conditions, with which it was entirely familiar, and found this stock to be worthless. We can not say that its action was erroneous.

The last assignment of cross-error challenges the action of the trial court in disallowing a charge against The American National Bank of $3,185.25. Oglethorpe, an accountant, who testified on behalf of the appellees, described this item as interest accrued as of July 15, 1929, on the assets delivered by The First National Bank to The American National Bank. The report of this same witness showed that this item had been "absorbed in operations."

We think the trial court correctly held that this was merely a bookkeeping entry, and that there was no evidence that The American National Bank had collected it or in any way profited thereby.

The decree appealed from will be amended by increasing the amount of the recovery allowed the appellees by the amount of $15,638.31, bringing the total amount of the judgment in favor of the appellees against the appellant to the sum of $184,743.31, with interest from October 7, 1932. With this amendment the decree is affirmed.

*Amended and affirmed.*