**ROCCO ENTERPRISES, INC., and Rocco Turkeys, Inc., Plaintiffs,**

v.

**CONTINENTAL CASUALTY CO., Defendant.**

**Civ. A. No. 87–0128–H.**

United States District Court, W.D. Virginia, Harrisonburg Division.

Dec. 8, 1988.

Daniel L. Fitch, Wharton, Aldhizer & Weaver, Harrisonburg, Va., for plaintiffs.

M. Scott Ratliff, The Travelers Companies, Roanoke, Va., Leonard E. Barney, CNA Ins. Companies, Silver Spring, Md., Nicholas Wright, Robbinson, McGammon, Osthimer & Tatum, Richmond, Va., for Continental Cas. Co.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This matter is before the court on opposing motions for summary judgment. The dispute centers on the parties' conflicting interpretations of a policy provision determining "actual cash value" of the policyholder's finished stock. The plaintiffs, Rocco Enterprises, Inc. and Rocco Turkeys, Inc. ("Rocco"), who are poultry producers, originally sued both Continental Casualty Co. ("Continental") and the Travelers Indemnity Company ("Travelers"), under theories of breach of contract and estoppel by detrimental reliance. Travelers was voluntarily dismissed as a defendant pursuant to this court's order of November 25, 1987, leaving Continental as the sole defendant in this action.

### I. Facts

On December 26, 1987, a fire broke out at a cold storage warehouse in Harrisonburg, Virginia. Rocco had stored a large inventory of finished poultry in this warehouse. The fire consequently damaged or destroyed nearly four million pounds of packaged turkey which belonged to Rocco.

National Union Fire Insurance Company ("National") provided primary coverage for Rocco's loss. The primary coverage ceiling provided by National's policy was $2,500,000.00. Continental and Travelers each issued pro-rata policies which provided a layer of excess coverage for Rocco of up to $12,500,000.00. These policies specified that Continental would provide 80% of any necessary excess coverage; Travelers would pay the remaining 20%. Continental's policy expressly adopted the same warranties, terms, conditions, and definitions which the primary policy contained.

National, as the primary insurer, employed American International Adjustment Company ("AIA") to investigate and adjust Rocco's loss. Neither Continental nor Travelers attempted independently to adjust the loss. Representatives of AIA and Rocco met in Harrisonburg on January 2, 1986. At that meeting, National exercised its option to take possession of all of the damaged turkey at the price provided in the policy. Rocco alleges that during this meeting AIA's agents stated unequivocally that the value of the turkeys, as specified in the policy, would be fixed at the actual cash value of the turkeys on the day of the fire. Continental now argues that the policy requires the value of the turkeys to be set at the price for which the turkeys would have sold had no loss ever occurred, not at the market price on the date of loss.

Both Rocco and Continental have moved for summary judgment on Count I of the complaint, which alleges breach of contract. Continental and Rocco have stipulated that if Rocco prevails on Count I, then, in addition to monies already paid, damages shall be fixed against Continental at $294,517.57 plus interest. If Continental prevails on Count I, the parties have stipulated that no further damages shall be fixed against Continental. Continental has also moved for summary judgment on Count II of the complaint, Rocco's claim for estoppel by detrimental reliance. If this action proceeds under Count II, the parties have stipulated that Rocco's damages, if

any, shall be subject to further proof or stipulation. These issues, now having been fully briefed and argued, are ripe for disposition, and are resolved *infra*.

## II. *Count I—Breach of Contract*

Rocco's breach of contract claim centers squarely upon the proper interpretation of the language of a single policy endorsement, an endorsement which was originally attached to the primary policy and was subsequently adopted in Continental's excess coverage policy. *See* Continental's memorandum in support, exhibit B, p. 2. The disputed endorsement, labeled "Manufacturer's Selling Price Endorsement," reads as follows:

> It is a provision of this policy that the actual cash value of finished stock manufactured by the insured shall be that price, less all discounts and unincurred expenses, for which said stock would have been sold had no loss occurred.

Continental memorandum in support, exhibit A, p. 7. The court notes that this endorsement pertains strictly to finished stock, meaning stock which is ready for sale. The selling price endorsement does not address the valuation of any damaged real or personal property; such property is not at issue in this action.

Rocco argues that the language of this endorsement defines the actual cash value of finished stock as the price for which the stock would have been sold on the date of the loss. Continental claims that the endorsement simply defines actual cash value as that price for which the stock would have been sold had no loss occurred. The difference between these two interpretations is significant due to the date of Rocco's loss and the seasonal fluctuations in the price of turkey.

Demand and price for turkey, of course, peak during the months of November and December, then rapidly decline after the passing of the new year. Rocco's loss occurred at a the time of the year when the price of turkey, as a market commodity, was at its highest annual level. Rocco's argument that the policy's language prescribes valuation as of the date of loss

would thus allow it to capture the peak market price of its lost finished stock. Continental's contrary interpretation of the selling price endorsement would prohibit this result and would instead value the inventory through the falling market of the new year pursuant to existing sales orders and past sales performance.

In attempting to interpret the language of any insurance policy, the court first notes that its analysis is guided by well-settled principles of Virginia law. The Supreme Court of Virginia recently affirmed these familiar principles:

> Insurance policies are to be construed according to their terms and provisions and are to be considered as a whole. Where there is doubt or uncertainty and where the language of a policy is susceptible of two constructions, it is to be construed liberally in favor of the insured and strictly against the insurer. Where two interpretations equally fair may be made, the one which permits a greater indemnity will prevail because indemnity is the ultimate object of insurance.

*White Tire Distributors, Inc. v. Pennsylvania National Mutual Casualty Insurance Co.*, 235 Va. 439, 441, 367 S.E.2d 518, 519 (1988), citing *Surety Corporation v. Elder*, 204 Va. 192, 197, 129 S.E.2d 651, 655 (1963) (citations omitted).

### A. The Language of Policy

■ This court's analysis of the selling price endorsement must thus begin with an examination of the actual language of endorsement itself. The court finds this language to be simple and unambiguous. The endorsement plainly provides that the actual cash value of finished stock shall be the price for which the stock "would have been sold had no loss occurred." Rocco argues that this phrase may be fairly interpreted to mean "would have been sold at the time of the loss." If this were true, and the policy's language were indeed genuinely ambiguous, then the court would of course construe the policy strictly against the insurer, pursuant to the doctrine of *contra preferentem, See Id.*

However, Rocco's interpretation would require the court first to erase the words "had no loss occurred" from the face of the endorsement, and then to write "at the time of loss" in their place. This court will not rewrite the insurance policy in this manner.[1] To do this would require the adoption of a "strained or unjustified construction of the policy." *See First American Title Insurance Co. v. Seaboard Savings & Loan Association*, 227 Va. 379, 384–85, 315 S.E.2d 842, 845 (1984). The court finds that the plain and unambiguous language of the insurance policy is subject of only one reasonable interpretation: that the finished stock be valued at the price for which the stock would have been sold had no loss occurred.

Of course, if the stock had been sold on the date of the loss, then, pursuant to the endorsement's language, the stock would then be valued at the market price on the date of the loss. Although Rocco has presented evidence indicating that it has on occasion sold its entire inventory in a single day, the plaintiff has presented no evidence to indicate that the lost stock in question would have been sold on the day of the loss or immediately thereafter. Thus the court rejects Rocco's argument for valuation on the date of loss because it is contrary both to the plain language of the insurance policy and to the evidence before the court.

The court notes that the valuation scheme adopted in this policy may indeed require projections of future sales based upon past sales performance. Rocco argues that because the policy does not specify a precise time and place for valuation, the policy is ambiguous. Such reasoning is erroneous. This court has already held that the ordinary language of the policy plainly requires the stock to be valued at the price for which it would have been sold absent any loss. Thus the policy's own method of valuation precludes fixing value at a specified time and place. The absence of such specific pricing information in the policy does not render the language of the policy ambiguous; on the contrary, the absence of a time and date for valuation is mandated by the plain language of the policy itself.

### B. Policy Considered as a Whole

Although the court, having found the endorsement's language to be unambiguous, could properly conclude its analysis at this point, it further notes that the terms and provisions of the policy, when considered as a whole, also support Continental's position. The policy's first endorsement, which provides for the valuation of real or personal property, specifically provides that any such property covered under the policy is to be valued "as of the date of loss." This endorsement originally covered real property alone but was later amended to include personal property as well. Continental memorandum in support, exhibit A, p. 16. However, the disputed selling price endorsement, as noted *supra*, contains no such specific language which adopts "date of loss" valuation for finished stock. Instead, the selling price endorsement sets the value for finished stock at the price for which the stock would have sold had no loss occurred. The presence of concrete language adopting "date of loss" valuation for real and personal property only makes the absence of such policy language in regard to finished stock appear all the more conspicuous and intentional.

The court also notes that the policy's "loss of income" endorsement clearly contemplates the type of "uncertain" valuation against which Rocco so strenuously argues. The endorsement states that "in determining loss of income due consideration shall be given to the experience before the date of damage or destruction and probable experience thereafter *had no loss occurred.*" Continental memorandum in support, exhibit A, p. 19 (emphasis added). Although any loss of income resulting from damage to finished stock is specifically excluded from this endorsement, the endorse-

[1] Such "judge-made insurance" redistributes the risk which parties agreed to allocate between themselves, often resulting in potential harm to both the insurer and the insured, as well as to the insurance public. *See generally*, K. Abraham, *Distributing Risk, Insurance, Legal Theory, and Public Policy* 101–132 (1986).

ment plainly prescribes the type of projective valuation which Rocco claims to be inappropriate in the selling price endorsement. Moreover, the use of the phrase "had no loss occurred" in the loss of income endorsement is mirrored in the selling price endorsement. The repetition of this phrase further confirms this court's belief that the selling price endorsement's method of valuation was intended to resemble the projective valuation already found in the loss of income endorsement.

Rocco's argument that the courts consistently fix valuation in price endorsements at the time of the loss is misleading. The authority offered by Rocco is readily distinguishable. In all but one case cited by the plaintiff, the courts interpreted policy provisions which expressly required valuation at the time of loss.[2] In the remaining case, the court interpreted a policy which was silent as to the method of valuation.[3] The endorsement in the instant action is quite different as it neither expressly adopts valuation at the date of loss nor is it silent as to the method of valuation. The court consequently finds none of this authority to be persuasive in interpreting the language of the particular endorsement before the court.

For purposes of this motion for summary judgment, the court will, however, accept Rocco's argument that price endorsements customarily fix value at the date of loss. Even so, the absence of such customary language explicitly adopting "date of loss" valuation only leads the court to believe that the parties intentionally meant to forego this usual method of valuation. This belief is borne out in the straightforward and plain language of the selling price endorsement itself.

## C. The Principle of Indemnity

Finally, Rocco has argued that the court should adopt "date of loss" valuation for the disputed selling price endorsement because it provides "certainty," while any projective method of valuation is too "uncertain," "speculative," and "inconvenient." The court initially notes that even if it were wholly to accept Rocco's characterization of the valuation method supported by Continental, it would still feel compelled to follow the intent of the parties as reflected in the plain language of the endorsement. The parties to an insurance contract are certainly free to adopt the "rule of certainty" espoused by Rocco. The court has already accepted Rocco's contention that a majority of parties do in fact chose "date of loss" valuation. But the parties to the insurance policy in this action did not make such a choice, as is evidenced by the policy's ordinary language. Moreover, the court feels compelled to make two brief observations in response to Rocco's arguments against the type of valuation reflected in the disputed policy.

First, this court finds that the policy's method of valuation is consistent with the guiding and fundamental principle of insurance law, the principle of indemnity. Indemnity is the "ultimate object of insurance." *See e.g., White Tire Distributors, Inc. v. Pennsylvania National Mutual Casualty Insurance Co.*, 235 Va. at 441, 367 S.E.2d at 519 (1988). One can not insure what one does not have or legitimately expect to obtain. *See e.g.* 4 *Apple-*

---

**2.** *Citizens Ins. Co. v. Foxbilt, Inc.*, 226 F.2d 641, 641 (8th Cir.1955) ("actual cash value of property at the time of loss"); *Lumbermen's Underwriting Alliance v. Jessup*, 100 Ga.App. 518, 544, 112 S.E.2d 337, 355 (1959) ("market price of such stock as it existed at the time and place of loss"); *Erin Rancho Motels, Inc. v. United States Fidelity and Guaranty Co.*, 218 Neb. 9, 12, 352 N.W.2d 561, 563–64 (1984) ("actual cash value of such property at the time of the loss"; "all other property at actual cash value at the time of loss"); *American Casualty Co. of Reading, Penn. v. Parks–Chambers, Inc.*, 111 Ga.App. 568, 142 S.E.2d 275, 277 (1965) ("actual cash value of the property at the time of loss"); *Crisp v. Security*

*Nat'l Ins. Co.*, 369 S.W.2d 326, 328 (Tex.1963) ("actual cash value of the property at the time of loss"); *Milligan v. Donegal Mut. Ins. Co.*, 401 Pa. 519, 520, 165 A.2d 74, 75 (1960) ("actual cash value of the property at the time of loss"); *McAnarney v. Newark Fire Co.*, 247 N.Y. 176, 181, 159 N.E. 902, 903 (1928) ("actual cash value of the property at the time of loss").

**3.** *Roswell Trailers, Inc. v. Potomac Ins. Co.*, 91 N.M. 502, 503, 576 P.2d 1133, 1134 (1978) ("actual cash value, not exceeding net cost of replacement").

man Insurance Law & Practice §§ 2121–25 (1969). The purpose of the policy's selling price endorsement is simply to indemnify Rocco for any profit which it would have made from the sale of finished stock had no loss occurred. There is no mystery here. With this object in mind, the selling price endorsement plainly states that the actual cash value of finished stock shall be the price for which the stock would have sold had no loss occurred. This policy language is an attempt to accurately indemnify the insured by allowing him to capture any lost profit while preventing him from enjoying a windfall at the expense of the insurer.

The court agrees with Rocco that the "date of loss" valuation is likely to be more convenient for the parties since it requires no projections of future sales. Parties to insurance contracts are of course free to adopt such a valuation method strictly for its convenience and ease of operation. Still, the court notes that this "rule of certainty" adopting strict "date of loss" valuation is a rule which is practically certain either to over-indemnify or under-indemnify an insured who operates in a fluctuating market. Valuation as of date of loss is therefore not entirely consistent with the principle of indemnity.

The disputed policy's valuation method for finished stock is, on the contrary, completely consistent with the principle of indemnity. As a result of this accuracy in indemnification, the policy's method of valuation also reduces the "moral hazard" inherent in all property insurance.[4] Parties to an insurance contract may bargain freely for their policy's method of valuation. Some will no doubt prefer the convenience of valuing inventory at its price on the date of loss while others will prefer to value the inventory at the price for which it would have sold had no loss occurred. Either choice is acceptable, but this court will not effectively rewrite the terms of an insurance contract already agreed upon by the parties.

A second response to Rocco's argument concerns the alleged problems which will result from the "speculative" valuation method adopted in the selling price endorsement. Rocco argues that the insurer and insured will undoubtedly have great difficulty agreeing on the price for which the inventory would have sold had no loss occurred, and therefore confusion, controversy, and litigation will invariably result. The court again notes that parties who wish to avoid such potential for controversy may simply opt for "date of loss" valuation. Still, if some parties can not agree on the price for which the inventory would have been sold absent loss, quite unlike Rocco and Continental in the instant action, see Plaintiff's exhibit # 1, the policy itself provides an alternative mechanism for the resolution of the dispute. A standard appraisal provision, common in property insurance policies, normally provides for the selection of independent appraisers in the event that the insured and insurer fail to agree on the amount of loss. See e.g. Continental's memorandum in support, exhibit A, p. 23. The court is unconvinced that Rocco's prediction of such dire consequences will necessarily result from the adoption of a projective method of valuation for lost inventory.

Because Continental's interpretation of the disputed policy language is consistent with the unambiguous language of the policy endorsement, with the policy as a whole, and with the guiding principles of insurance law, the court finds that Continental has not breached its contract for insurance with Rocco. Since no material facts are in dispute, Continental is entitled to judgment as a matter of law on Count I of the plaintiff's complaint, pursuant to Fed.R. Civ.P. 56(c).

### III. *Count II—Estoppel By Detrimental Reliance*

■ Continental has also moved for summary judgment on Count II of the com-

---

**4.** "Moral hazard as a pattern of human behavior will arise whenever the extent ... of a performance is partly or totally determined by the beneficiary, whereas consideration ... is not under the control of the party under obligation." Forster & Steinmuller, *An Alternative View of Moral Hazard*, 45 J. Risk & Ins. 531 (1978). For example, a moral hazard exists when an insured is tempted to "cash in" a policy in order to capture a peak price.

plaint, Rocco's claim for estoppel by detrimental reliance. Rocco claims that at the January 2, 1986, meeting Continental's alleged agent, AIA, represented that the insurer would exercise its right to salvage the damaged or destroyed turkey and in return Rocco would receive the actual cash value of the turkey as of the date of the loss. Rocco now claims that Continental is estopped from asserting a lower valuation for the packaged turkey because it relied to its detriment on these representations of Continental's agent, AIA. Continental argues that summary judgment is appropriate because, as a matter of law, Continental could not have relied to its detriment on the representations of AIA.

The relevant portion of the policy's salvage provision provides that "in the event of loss hereunder it shall be the option of the company to take all or any part of the property at the agreed or appraised value ..." Continental's memorandum in support, exhibit A, Section 21, p. 23. The court finds that this language grants the insurer a unilateral right to salvage any property claimed under the policy. The phrase "the agreed or appraised value," by its plain meaning, does not, as Rocco, argues, imply that the insurer and the insured must make a new agreement on the salvage price after every loss claimed by the insured. Instead, the provision simply allows an insurer to exercise its exclusive right to salvage claimed property, with the consequent obligation to pay the insured the price already agreed upon in the policy. If the insured and the insurer fail to agree as to the amount of the loss, then the parties may choose to have the loss independently appraised, as provided in the policy. See e.g. Continental's memorandum in support, exhibit A, section 14, p. 23. The insurer's decision to salvage does not set off a new round of bargaining over the price of the salvage. The court thus rejects any argument by Rocco which suggests that Continental's ability to salvage is dependent upon the consent of Rocco.

It is well-settled that detrimental reliance is a prerequisite for recovery under a theory of estoppel. *American National Bank v. Ames*, 169 Va. 711, 738–39, 194 S.E. 784, 793, *cert. denied*, 304 U.S. 577, 58 S.Ct. 1046, 82 L.Ed. 1540 (1938). Continental argues that because Rocco had no choice in the matter of salvage, it could not have been injured by its reliance on the statements of AIA. The court does not agree. Rocco argues that the damaged whole turkeys could have been cleaned, reprocessed into smaller parts, and sold for a price significantly higher than the payment now proposed by Continental, and even higher than the actual cash value of the inventory on the date of loss. *See* Rocco's memorandum in opposition, exhibit F. If these facts are true, then detrimental reliance is, at least, conceivable. Rocco may argue that its decision to file an action on the policy was premised upon its reliance on AIA's representations that Rocco would receive the date of loss price for the damaged turkey. If Rocco had been told that it would in fact receive less than this price, then Rocco may reasonably argue that it would not have claimed the damaged inventory as a loss under the policy, and would have instead cleaned and further processed the turkey itself in order to capture its value at or above the date of loss price.

In reviewing this motion for summary judgment, the court must view the facts alleged in the pleadings in the light most favorable to Rocco. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed. 2d 80 (1957). Of course, unresolved issues relating to the agency of AIA, the specific representations made at the January 2, 1986, meeting, and the ability of Rocco further to process and sell the turkey are all questions of material fact which Rocco must prove in order to recover under its estoppel theory. The court thus finds that the existence of genuine issues of material facts preclude the imposition of summary judgment as to Count II of the plaintiff's complaint, pursuant to Fed.R.Civ.P. 56(c).

An appropriate Order shall this day issue.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

ADJUDGED AND ORDERED that:

1. The plaintiff's motion for summary judgment as to Count I shall be, and it hereby is, denied.

2. The defendant's motion for summary judgment as to Count I shall be, and it hereby is, granted.

3. The defendant's motion for summary judgment as to Count II shall be, and it hereby is, denied.